# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3012

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Missouri. |
| A. Blair Stover, Jr., | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: June 17, 2011
Filed: August 16, 2011

_____

Before MURPHY and SMITH, Circuit Judges, and SCHREIER,[1] District Judge.

_____

MURPHY, Circuit Judge.

The United States brought this civil action under 26 U.S.C. § 7408 to enjoin A. Blair Stover, Jr. from promoting several fraudulent tax schemes. After a court trial the district court[2] permanently enjoined Stover from promoting his schemes, ordered him to advise the Internal Revenue Service (IRS) of any tax arrangements or business entities formed at his direction, and required him to provide a copy of its order to his

_____

[1] The Honorable Karen E. Schreier, Chief Judge, United States District Court for the District of South Dakota, sitting by designation.

[2] The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

clients. On appeal, Stover argues that the injunction was not supported by adequate factual findings and legal conclusions, and that it was overbroad, an impermissible delegation of Article III power, and an unconstitutional prior restraint. We affirm.

## I.

In all material respects the following facts are undisputed and were recounted by the district court. For many years Stover has worked for several accounting firms in Missouri. He received undergraduate and graduate degrees in business administration with an emphasis in marketing and finance and has earned a law degree from the University of Missouri at Kansas City. He has been licensed to practice law in Missouri since 1990 and remains a member of the Missouri bar. Stover has also taken courses towards an L.L.M. in taxation and has passed the tests to become a certified public accountant (CPA), but he does not have his CPA license.

For several years in the early 1990s, Stover worked for the accounting firm of Coopers and Lybrand. His duties included preparing requests for IRS rulings as well as researching and drafting opinions and memoranda on tax issues. In 1993 Stover began working at the accounting firm of Grant Thornton LLP as a tax manager. Over the next eight years he rose to senior tax manager and tax principal at Grant Thornton. Then in 2001 Stover joined Kruse Mennillo LLP, another accounting firm, as an equity partner. Stover's role at Kruse Mennillo was to be a "rainmaker" who promoted new business ventures to reduce clients' tax liability.

During his time at Grant Thornton and Kruse Mennillo, Stover promoted, sold, and organized several different tax arrangements, three of which are the focus of this appeal. Each was premised on a small business owner transferring income from his business, labeled the "operating company," to a separate and newly created entity denominated as a "management company." Under each scheme the operating company would retain the management company to perform "management services."

Fees paid by the operating company to the management company would be deducted from the operating company's taxable income.  The management company's income would then be deferred or completely excluded from taxation through devices such as the accrual method, employee stock ownership plans (ESOPs), and Roth IRAs.

These schemes would soon pose numerous tax law problems.  It is undisputed that the management companies did not provide any management services to the operating companies; instead, the management fees would be set by Stover at a "defensible" amount necessary to offset a large portion of the operating company's income.  In some cases the management company had no employees or bank accounts, and the management fees were recorded only on paper.  As explained below, the district court found that deferral or exclusion from taxation of these fees violated laws defining when services are properly accrued, "top heavy" rules for ESOPs, and contribution and income limits for Roth IRAs.

The first structure Stover promoted was the "Parallel C" scheme, which had been developed and promoted by others at Grant Thornton before Stover began working there.  Parallel C structures were sold to small business owners who owned subchapter S corporations and used a January 1 to December 31 tax year.[3]  In December, near the end of the tax year, the operating company would pay a large "management fee" to a management company newly created at Stover's direction for bogus management services the company did not actually provide.[4]

---

[3] See 26 U.S.C. §§ 1361–66.  Subchapter S corporations pass their earnings through to the owners, preventing double taxation of the business's earnings.

[4] According to the complaint, the management companies were to provide payroll services, negotiate leases, obtain insurance policies, and purchase and resell office equipment and supplies. None of these services was ever provided.

The operating company would accrue these purported management fees for the following year to offset most or all of its income for the current year. In turn, the management company would elect to follow a December 1 to November 30 fiscal year, and would not become liable for tax on the income until the end of its tax year. In effect this arrangement allowed the operating companies improperly to defer taxation on most or all of their income for eleven months. See also United States v. Davison, No. 08-0120-CV-W-GAF, 2010 WL 1935951, at *1 (W.D. Mo. May 11, 2010) (describing a similar Parallel C scheme by Stover's former business partner).

The district court found that two particular Parallel C structures set up by Stover violated tax laws, but noted that there was evidence of "many others." It determined that the Parallel C structures violated rules for accrual of fees for services, see 26 U.S.C. § 461(h), requirements for the deduction of ordinary and necessary business expenses, see 26 U.S.C. § 162(a), and the principle that structures creating tax benefits must have economic substance. See Gregory v. Helvering, 293 U.S. 465, 469–70 (1935).

While at Grant Thornton and for a short time at Kruse Mennillo, Stover sought to defer his clients' tax liability further using a second scheme known as an "ESOP/S" structure. The ESOP/S worked similarly to the Parallel C structure, with an added element: the management company would elect subchapter S status and Stover would create an employee stock ownership plan (ESOP) as the owner of the management company's stock. The ESOP's sole beneficiary would be the owner or owners of the operating company. Because an ESOP's income is not subject to taxation until distribution, this second scheme indefinitely deferred taxation on income until the money was distributed from the ESOP. See Davison, 2010 WL 1935951, at *1.

The district court identified five particular ESOP/S structures that violated various tax laws but stated that the record showed that Stover sold "more than twenty" of them. It found that the ESOP/S arrangements "suffered from a lack of business

-4-

purpose," "failed to insure the requirements for arm's length transactions were satisfied," and violated so called "top heavy" rules regulating ESOPs. See 26 U.S.C. §§ 414(b), 416, 1563(a)(2). It also pointed out that after Congress expressly outlawed ESOP/S schemes, see 26 U.S.C. § 409(p), Stover created an arrangement by which a previously created "shelf corporation" was used to create an ESOP, in an effort to backdate the ESOP and avoid the effective date of the new legislation.

After he began working at Kruse Mennillo and Congress had outlawed the ESOP/S structures, Stover developed and promoted the "Roth/S" structure. Like the two other schemes, the Roth/S involved creating a management company eligible for a subchapter S election. A Roth IRA would then purchase the management company's stock, and the Roth IRA's sole beneficiary was the owner of the operating company. The management fees would reduce the operating company's income, the management company's income would not be taxed because it passed through to its owners because of the subchapter S election, and the income allocations to the IRA would not be taxed because a Roth IRA's earnings are not taxable so long as any distributions are made after age 59 ½. As the district court explained, any amount Stover designated as management fees "would forever escape taxation."

The district court identified two specific Roth/S arrangements Stover promoted, but found that a conservative estimate indicated that he "sold between thirty-five and forty Roth/S arrangements." The district court determined that these arrangements failed to have any economic substance, violated contribution and income limits governing Roth IRAs, see 26 U.S.C. § 408A(c)(2)–(3), and contravened IRS Notice 2004-8. That notice had expressly declared that similar schemes were "abusive" and had required those owning and promoting them to disclose them to the IRS and to register them as tax shelters. See Notice 2004-8, 2004-1 C.B. 333 (2004).

As Stover promoted and sold these tax schemes, several of his clients raised questions about their validity. Daria Ussary, an office manager for one of his clients,

told Stover that she was not comfortable making journal entries requested by him for the company's books because they "didn't make any sense" to her. She left her position as office manager because of her concern about his schemes' validity. Other clients testified that Stover described the deductions for management fees as mere "paperwork transaction[s]," because the management companies "really didn't provide us any services." When one of his clients questioned whether it was a "legal and standard practice" to use management companies to deduct large, bogus management fees, Stover replied that it was. Stover told Ussary that he was "educated and he had gone to the best schools" and that she should just let Stover do his job.

The IRS conducted a lengthy and costly investigation into Stover's schemes. The district court found that agent Rhonda Kimball spent over three thousand hours (more than one year's normal work) unraveling transactions for just two of Stover's clients. It also found that even the most conservative estimate of the tax loss to the government caused by Stover's schemes was $100 million, and potentially as high as $800 million. Agent Janice Mallon testified that a "reasonable estimation" of the government's tax loss was $300 million. Apart from those costs, most of Stover's clients had to pay other professionals to "undo" the structures Stover promoted, organized, and sold. Many had to pay penalties to the government.

In February 2008, the government filed this action under 26 U.S.C. § 7408 to enjoin Stover from organizing or promoting these fraudulent tax schemes. After a court trial the district court entered an injunction in favor of the government. On appeal Stover challenges each paragraph of the injunction, which states as modified:

> 1. Defendant is enjoined from organizing, establishing, promoting, selling, offering for sale, or helping to organize, establish, promote, sell or offer for sale any tax plan involving the parallel C, ESOP/S, or Roth/S structures as described herein.

2.    Defendant is enjoined from organizing, establishing, promoting, selling, offering for sale or assisting in any financial or tax related arrangement without submitting, in writing to an IRS designee, a detailed plan explaining the financial or tax arrangement and all steps necessary for the arrangement to be legal under the tax code.  No such plan shall be implemented by defendant or with his assistance unless IRS approval is granted or thirty (30) days have passed since defendant sought approval.  If the IRS does not respond within thirty (30) days, Stover and his client may proceed subject to later review by the IRS[.]

3.    Defendant shall advise the IRS' designee of any business entity (corporation, LLC, LLP, limited partnership, etc.) formed by him or at his direction.   This shall occur within thirty days of the entities' formation.   The information provided shall include copies of the documents filed with the appropriate authorities to form the entity (e.g., Articles of Incorporation).  Defendant shall advise the principals of any such entity about this requirement.

4.    Defendant shall advise the IRS' designee of any new clients who consult with Defendant or retain his services for the purpose of obtaining tax advice, including other professionals' clients for whom Defendant provides such services.   This shall occur within thirty days of the provision of the advice or consultation.  Defendant will be required to advise the individual(s) with whom he consults or to whom he provides advice about this requirement.  Before consulting, providing advice or offering a letter of engagement, Defendant shall obtain the consent of any such client to the disclosure of the information required by this paragraph.

5.  Defendant shall provide a copy of this Order to (1) each of his current clients and (2) any other client of Kruse Mennillo for whom he provided advice, either to the client or to another member or employee of the firm for the benefit of that client.

## II.

We review the district court's permanent injunction under 26 U.S.C. § 7408 for abuse of discretion. See United States v. Davison, 407 F. App'x 997, 997 (8th Cir. 2011) (permanent injunction under § 7402(a)); United States v. Benson, 561 F.3d 718, 721 (7th Cir.), cert. denied, 130 S. Ct. 759 (2009); United States v. Schulz, 517 F.3d 606, 607 (2d Cir.) (per curiam), cert. denied, 129 S. Ct. 435 (2008); United States v. Gleason, 432 F.3d 678, 681 (6th Cir. 2005); United States v. Bell, 414 F.3d 474, 478 (3d Cir. 2005). The district court abuses its discretion only if it applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact. Gleason, 432 F.3d at 681–82.

Here, the government sought equitable relief expressly authorized by 26 U.S.C. § 7408(a). "When an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose." United States v. White, 769 F.2d 511, 515 (8th Cir. 1985), citing United States v. Buttorff, 761 F.2d 1056, 1059 (5th Cir. 1985). The traditional criteria for permanent injunctive relief need not be discussed. See United States v. Landsberger, 692 F.2d 501, 503–04 (8th Cir. 1982) (affirming a permanent injunction under 26 U.S.C. §§ 7402 and 7407 without discussing the criteria for a permanent injunction).

26 U.S.C. § 7408 authorizes the United States to obtain an injunction if the court finds (1) that the person has engaged in "specified conduct," and (2) that "injunctive relief is appropriate to prevent recurrence of such conduct." As relevant here, "specified conduct" is "any action, or failure to take action," which is subject to

penalty under section 6700.  Id. § 7408(c)(1).[5]  If both requirements are satisfied the court may enjoin any activity subject to penalty under the tax code.  Id. § 7408(b).

Generally speaking, section 6700 requires that the government prove that the defendant was involved in an abusive tax shelter and that he knowingly made false statements about the tax benefits investors would receive if they participated in it. United States v. Raymond, 228 F.3d 804, 811 (7th Cir. 2000), cert. denied, 533 U.S. 902 (2001); see Gates v. United States, 874 F.2d 584, 586 (8th Cir. 1989).[6]  Courts applying § 6700 have identified four elements the government must prove: (1) organization or participation in the sale of certain investment plans or arrangements; (2) statements by the defendant regarding the allowability of deductions or tax credits, the excludability of income, or the securing of other tax benefits; (3) knowledge or

_____

[5] Specified conduct also includes conduct subject to penalty under § 6701, which imposes penalties for any person who assists in the preparation or presentation of any tax document while knowing that document will result in an understatement of the tax liability of another person.  Though the government also invoked § 6701 as authority for the injunction, the district court found it unnecessary to "complicate or lengthen" its order by discussing that section.  It noted, however, that "in large measure" its analysis would justify a finding that Stover had also violated § 6701.

[6] In relevant part, section 6700 imposes penalties on any person who–
(1)      (A) organizes (or assists in the organization of)—
                (i) a partnership or other entity,
                (ii) any investment plan or arrangement, or
                (iii) any other plan or arrangement, or
        (B) participates (directly or indirectly) in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and
(2) makes or furnishes or causes another person to furnish (in connection with such organization or sale)—
        (A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter.

reason to know that the statements are false; and (4) statements which pertain to a material matter. See Benson, 561 F.3d at 721–22; Gleason, 432 F.3d at 682; United States v. Estate Pres. Servs., 202 F.3d 1093, 1098 (9th Cir. 2000); United States v. Campbell, 897 F.2d 1317, 1320 (5th Cir. 1990). If each of the factors is satisfied, a district court may issue an injunction if it is "appropriate to prevent recurrence of such conduct." 26 U.S.C. § 7408(b)(2).

A.

In a comprehensive forty five page order the district court concluded that the government had proven each of the statutory elements. It had shown that Stover knowingly made false statements with respect to the Parallel C, ESOP/S and Roth/S structures that caused his clients to purchase them. Stover's principal argument on appeal is that the district court's findings and conclusions were insufficient to support an injunction because they did not precisely parallel the language in § 6700. For example, Stover argues that the district court did not make any finding that he "made false (and material) statements, in connection with the organization or sale of an entity, plan or arrangement, with respect to the allowability of any income-tax deduction or credit, the excludability of any income, or the security of any other tax benefit, by reason of holding an interest in the entity, or participating in the plan or arrangement."

We reject Stover's hypertechnical criticism of the district court's order. Section 6700 is a linguistically complex and intricate statute, and the district court need not include the entire statutory language in each of its findings and conclusions. As long as the district court's injunctive order, read as a whole, demonstrates that each of the statutory criteria is satisfied, we will find no abuse of discretion. See Gleason, 432 F.3d at 681–82. And as we explain below, the district court's exhaustive order more than satisfies each of the four requirements in § 6700.

Abusive tax promoters must either organize, promote, or sell qualified tax shelters to come within the scope of §§ 7408 and 6700. This element should be defined "broad[ly]," and is satisfied simply by "selling an illegal method by which to avoid paying taxes." Benson, 561 F.3d at 722; see United States v. Kaun, 827 F.2d 1144, 1147, 1149 (7th Cir. 1987) (noting that any arrangement, plan, or investment whose principal purpose is the avoidance or evasion of federal income tax qualifies).

Stover argues that the district court's findings on this element were insufficient because they show only that Stover implemented or executed, rather than organized or sold, his tax avoidance schemes. In Stover's words, the only statements he made were "in the context of the *implementation* of the arrangement[s]," rather than in connection with their "*organization* or *sale*." App. Br. at 39 (emphasis in original). The government responds that Stover indisputably promoted and sold the three schemes and thus that this element of the statute is clearly satisfied.

We agree with the government. The record demonstrates that Stover "set up" a Roth/S structure for his client Raymond Anderson, and Parallel C and ESOP/S arrangements for Donald Clark, just as two examples. To "set up" is to organize a business entity. Stover's argument that he merely "implemented" or "executed" these arrangements therefore rings hollow. This is especially true in light of the voluminous testimony that Stover's clients specifically sought to use his schemes to reduce their tax liability. Because Stover sold his clients "an illegal method by which to avoid paying taxes," we conclude that he organized, promoted, and sold tax abusive schemes within the meaning of § 6700. See Benson, 561 F.3d at 722.

Stover next argues that the district court's findings that he "recommended" or "advised" his clients to purchase the tax avoidance structures were insufficient. He suggests that the content of his "assurances" is unclear from the district court's order, such that any statements he made could not fall within the ambit of § 6700.

-11-

Stover's position is contrary to well settled law. At least two types of statements are covered by § 6700: those "directly addressing the availability of tax benefits," as well as those "concerning factual matters that are relevant to the availability of tax benefits." Campbell, 897 F.2d at 1320. The record shows that Stover made both types. As the district court found, he "advised his clients to set up these entities in order to save taxes." That his statements came in the form of recommendations and advice does not make them any less authoritative. See, e.g., Gleason, 432 F.3d at 684 (tax protester's "advice" qualified as a statement under § 6700). The district court's findings sufficed to show that Stover made qualifying statements under § 6700.

Stover's principal argument on appeal is that even if he gave his clients advice and made recommendations, the district court "failed to acknowledge the requirement that a statement, in order to be within the scope of [§ 6700], must be false (or fraudulent)," and that it failed to analyze whether any statement Stover made was actually false. Stover further asserts that a statement "cannot be considered 'false or fraudulent,' *unless* it is *actually contrary to the law*. App. Br. at 35 (emphasis in original). For Stover, a statement is only contrary to the law when "a reasonable, well-informed analysis would lead a knowledgeable tax professional to conclude that it has a *zero* (or nearly zero) percent chance of being upheld on the merits." Id. Stover cites no authority for this exceedingly narrow concept, and we could find none.

We have defined "false" in the tax law context as "untrue and known to be untrue when made." United States v. Holecek, 739 F.2d 331, 335 (8th Cir. 1984), cert. denied, 469 U.S. 1218 (1985). Thus, Stover's statements about the Parallel C, ESOP/S, and Roth/S schemes would be false under § 6700 if when he made them he knew or had reason to know they were untrue. The district court's order is consistent with this definition of falsity. Contrary to Stover's assertions, it acknowledged that his statements must have been false to fall within the ambit of § 6700. The district court expressly cited § 6700 as penalizing a person who "knows or has reason to know

-12-

that the statement is false or fraudulent."  The court went on to analyze statements Stover made as he organized, promoted, and sold the Parallel C, ESOP/S, and Roth/S arrangements, and it expressly considered factors relevant to a defendant's knowledge of the falsity of his statements.  These included the extent of Stover's reliance on knowledgeable professionals, his level of sophistication and education, and his familiarity with tax matters.  Gleason, 432 F.3d at 683; Estate Preservation Services, 202 F.3d at 1103; Kaun, 827 F.2d at 1149.

With respect to the Parallel C structures, the district court found that Stover began recommending them to Grant Thornton's clients after he started working there and that his sole motivation "in promoting [them] was to defer recognition of income." It found that Stover advised one client to form a Parallel C structure solely "in order to reduce taxes," even though there was no evidence of "any effort to properly value the 'services' [the management company] would be providing."  It also found that Stover advised another client "to adopt the parallel C structure" even though the management company "did not actually pay management fees; the income and expenses only appeared as entries on the companies' books."  When Stover's client Donald Clark questioned whether it was a "legal and standard practice" to create sham management companies solely for tax savings purposes, Stover replied that it was. Stover's statements were false because they untruthfully conveyed that his clients' tax arrangements did not need to have economic substance.  See Campbell, 897 F.2d at 1320–21 (disregarding an abusive tax promoter's transactions because they lacked economic substance); United States v. Philatelic Leasing, Ltd., 794 F.2d 781, 786 (2d Cir. 1986) (same).  Stover's statements with regard to the ESOP/S and Roth/S arrangements suffered from these same infirmities.

Stover's statements regarding all three schemes were also false because of what he failed to convey: that deductions taken under 26 U.S.C. § 162(a) must be "ordinary and necessary" for the deducting business.  The district court found that Stover

"advised his clients to set up these entities in order to save taxes without also advising them of the potential pitfalls and the actions necessary to guard against the obvious conclusion that the transaction was a sham and bore no relation to reality." Section 7408(c) includes "failure to take action" as conduct subject to penalty, and courts have repeatedly held that a tax promoter's failure to advise his clients of the requirements for a proper deduction qualifies as a false statement. See, e.g., Gleason, 432 F.3d at 682–83 (tax protester's failure to "properly qualify" his assertions about the deductibility of everyday household expenses under § 162(a) amounted to "flagrantly false" statements); Estate Preservation Services, 202 F.3d at 1101 (scheme promoting deduction under § 162(a) which was merely a "camouflaged assignment of income" solely to gain a tax advantage was thus a false statement).

With respect to the ESOP/S arrangements, the district court found that Stover persuaded his clients to create operating and management companies with the same group of people owning stock in both. He then failed to notify his clients of tax code provisions disqualifying ESOPs that favor key employees. See 26 U.S.C. § 416 (discussing "special rules for top-heavy plans"); Id. § 414(b) (treating all employees of a controlled group of corporations as employed by a single employer); Id. § 1563(a) (defining a "controlled group of corporations"). Given Stover's years of tax and accounting experience and his significant education in the area, he had reason to know that such schemes were invalid. The failure to notify his clients that he had created invalid ESOPs was therefore a knowingly false omission under § 6700. See Campbell, 897 F.2d at 1322 ("[T]he reason to know standard allows imputation of knowledge so long as it is commensurate with the level of comprehension required by the speaker's role in the transaction."), citing H.R. Rep. No. 97-760, at 572 (1982) (Conf. Rep.), as reprinted in 1982 U.S.C.C.A.N. 1190, 1344.

The district court also found that Stover intentionally circumvented legislation specifically designed to outlaw this type of ESOP/S scheme. See 26 U.S.C. § 409(p).

-14-

Because the new law only applied to plans established after March 14, 2001, Stover arranged for client Thomas Barnes to obtain a previously created "shelf corporation" which had purportedly already created an ESOP. The district court found that this scheme was "legally unsupportable" because the shelf corporation "had no employees" at the time Barnes purchased it, meaning it "could not have an ESOP." We agree that this "backdating" of a corporation to avoid newly enacted legislation qualifies as a fraudulent statement under § 6700.

With respect to the Roth/S arrangements, the district court found that Stover began promoting the schemes in late 2001 and early 2002, and that a "key selling point" for Stover's clients was that any amount designated as management fees would "forever escape taxation." It noted that to someone of Stover's experience and sophistication, complete exclusion from taxation of such large amounts of income "should have been a clue to [Stover] that the structure was unlawful." It further found that the Roth/S skirted income limits applicable to Roth IRAs. By reducing the operating company's income, the Roth/S decreased the owner's income and thus made the owner eligible for a Roth IRA which he would otherwise not have been. See 26 U.S.C. § 408A(c)(3). Similarly, the Roth/S scheme circumvented statutory contribution limits on IRAs because the amount deposited into the IRA to purchase management company stock was far less than the actual value of the stock by virtue of the management fees which would soon be transferred to it. See 26 U.S.C. §§ 219(b), 408A(c)(2). Stover never advised his clients to pay the excise tax for excess contributions, see 26 U.S.C. § 4973, and instead just assumed that the contribution limit had not been exceeded. Compare Davison, 2010 WL 1935951, at *9-10 (describing how similar schemes by Stover's former partner "flout[ed]" the tax laws).

Stover's statements were also false because they were contrary to express IRS guidance. In December 2003 the IRS published Notice 2004-8, entitled "Abusive Roth IRA Transactions." That notice described arrangements which were designed

-15-

to "avoid the limitations on contributions to Roth IRAs" and declared that such transactions and any similar transactions were "listed" transactions which needed to be described to the IRS. A listed transaction was defined as any transaction between a person or any business controlled by that person and any corporation whose shares were owned by a Roth IRA formed for the benefit of that person. See Notice 2004-8, 2004-4 I.R.B. 333, 2004-1 C.B. 333 (2004). This describes perfectly the Roth/S arrangements organized, promoted, and sold by Stover.

As the district court found, Stover nonetheless advised his clients that disclosure of the Roth/S structures was not necessary, principally because Notice 2004-8 did not apply to S corporations and because the Roth/S structures were not "substantially similar" to those described in the Notice. The district court assessed Stover's reasoning as "so specious that he should have known it was wrong," since S corporations are still corporations and since the Roth/S arrangement is substantially similar to the Roth/C structure described in the Notice. The district court did not clearly err in finding that Stover ignored applicable tax authorities, considering them "unworthy of acceptance." We conclude that Stover made numerous false statements in connection with the sale of the Parallel C, ESOP/S and Roth/S arrangements.

Stover finally argues that the district court's findings about his statements were insufficient because in none of them was "the amount of the management fee . . . already determined," and that "*only* under such circumstances" could any of his statements have been false and material. App. Br. at 37 (emphasis in original). Stover thus argues that his statements did not "pertain to a material matter" under section 6700 because they did not include specific dollar amounts.

A matter is material if it would have a "substantial impact on the decision making process of a reasonably prudent investor." S. Rep. No. 97-494, at 267 (1982), as reprinted in 1982 U.S.C.C.A.N. 781, 1015. See also Benson, 561 F.3d at 724;

-16-

Gleason, 432 F.3d at 683; Buttorff, 761 F.2d at 1062. The district court found that the amount and nature of the management fees Stover directed his clients to deduct "were material for financial statement purposes." It also cited numerous examples of Stover's clients who purchased his schemes because of the significant tax advantages the schemes purported to confer.

We agree with the district court that Stover's statements were material under § 6700. There is a wealth of record evidence that Stover's clients purchased his tax arrangements in large degree because of the tax advantages he promoted. He promised to reduce his clients' taxable income by hundreds of thousands of dollars. Any such promise would have had a substantial impact on the decision making process of a reasonably prudent investor. See Gleason, 432 F.3d at 683 (abusive tax promoter's "exaggerations and misstatements" about his tax schemes "undoubtedly influenced individuals deciding whether to purchase" them).

Stover's argument on this issue is also entirely without legal support. Section 6700 does not require inclusion of specific dollar amounts for a statement to be false or material. All that the statute requires is that a defendant have knowingly made a false or fraudulent statement pertaining to a material matter in connection with the organization or promotion of covered tax arrangements. That requirement is more than satisfied in Stover's case especially in light of his level of education, sophistication, and experience handling tax matters, Gleason, 432 F.3d at 683; Raymond, 228 F.3d at 812, and in light of the overwhelming testimony that his clients purchased his schemes because of the numerous tax advantages he promised his arrangements would provide. See White, 769 F.2d at 515; Buttorff, 761 F.2d at 1062.

In sum, the district court did not err in finding that Stover promoted, sold, and organized three different tax schemes and knowingly made false statements in connection with them which caused his clients to purchase them. The first element

-17-

of § 7408—that the defendant have engaged in "specified conduct"—is therefore satisfied.  See 26 U.S.C. §§ 7408(b)(1), 7408(c)(1), 6700.

B.

Section 7408(b)(2) and applicable cases further require a finding that "injunctive relief is appropriate to prevent recurrence of such conduct" based on the totality of the circumstances.  The following factors are relevant to this inquiry: the gravity of harm caused by the offense; the extent of the defendant's participation and degree of scienter; the isolated or recurrent nature of the infraction; the degree to which the defendant recognized the culpability of the conduct; the sincerity of any promises not to commit future violations; and the likelihood that the defendant's customary business activities might again lead to a similar transaction.  See, e.g., Benson, 561 F.3d at 724; Gleason, 432 F.3d at 683; United States v. Schiff, 379 F.3d 621, 625 (9th Cir. 2004), cert. denied, 546 U.S. 812 (2005).

On his appeal Stover hardly challenges the district court's findings on this statutory element.  Given the millions of dollars in tax loss to the government and the significant additional penalties paid by his clients, his experience and sophistication in tax matters, his continued efforts to circumvent applicable tax provisions, and his continued failure to recognize his own culpability (even on appeal), we agree that injunctive relief is necessary to prevent Stover from continuing to organize, sell, and promote illegal tax schemes. See Benson, 561 F.3d at 724 (injunction necessary when defendant's conduct "was not isolated, but continuous," he did "not acknowledge his culpability," and despite his assurances, he was "not likely to stop without an injunction"); Raymond, 228 F.3d at 814 (injunction necessary in part because of the government's significant loss and large administrative burden, the defendants' activities "were not an isolated instance of misconduct," and the defendants had  not

expressed remorse and had steadfastly maintained their total lack of culpability). The district court's findings of fact and legal conclusions satisfied the elements of § 7408, and we therefore conclude that an injunction was appropriate.

III.

Stover next argues that the permanent injunction exceeded the scope of available relief under § 7408. He specifically takes issue with the district court's failure to "confine" the enjoined conduct to "the making of statements of the kind subject to penalty under § 6700." He also argues that the last three paragraphs of the injunction impermissibly mandate "affirmative conduct," rather than simply preventing him from making false or fraudulent statements.

Stover misapprehends both the plain language of § 7408 and the many appellate decisions interpreting it. Once the statutory prerequisites are satisfied, section 7408(b) authorizes a district court to enjoin tax protesters "from engaging in such conduct or in any other activity subject to penalty" under Title 26. The scope of prohibitable conduct is "broad," Benson, 561 F.3d at 722, and should be construed towards achieving the purpose underlying § 7408 to penalize "promoters of abusive tax shelters and other abusive tax avoidance schemes." White, 769 F.2d at 515 (quotation omitted); see also Kaun, 827 F.2d at 1147. The injunction prohibits Stover from organizing, promoting, or selling tax schemes without express or tacit approval of the IRS, and that type of activity qualifies as "other activity subject to penalty" within the meaning of § 7408(a).

Stover also incorrectly suggests that § 7408 does not authorize district courts to mandate "affirmative conduct." Numerous appellate decisions have affirmed injunctions ordering promoters of abusive tax schemes to take affirmative actions like

providing a copy of the injunction to their clients or supplying the IRS with client names and contact information. See, e.g., Schulz, 517 F.3d at 607–08 (affirming order requiring the tax protester to provide the government his clients' names and their contact information and to notify the clients of the injunction); Bell, 414 F.3d at 477 n. 3 items 2–4, 481–84 (affirming order requiring tax protester to notify past clients of bogus tax scheme, to provide the government with his client names and contact information, and to send copies of clients' returns to counsel for the government); Schiff, 379 F.3d at 630–31 (affirming preliminary order to post a copy of injunction on tax protester's website); Campbell, 897 F.2d at 1323 (affirming order to notify the IRS of any tax shelter with 30 day approval period and to notify clients of the injunction); see also Benson, 561 F.3d at 726–28 (reversing the denial of the government's request to require the abusive tax promoter to divulge his customer list to the IRS). Just as "mandated disclosure of factual, commercial information does not offend the First Amendment," Schiff, 379 F.3d at 630, it also does not exceed the scope of § 7408. The district court did not err in ordering Stover to advise the IRS of business entities formed at his direction or of new clients he retains, or in requiring him to provide a copy of its order to his or Kruse Mennillo's current clients.

IV.

Stover next argues that the provision requiring express or tacit IRS approval before Stover organizes, promotes, or sells future tax schemes is an impermissible delegation of Article III authority. He argues that the district court delegated to the IRS "the function of determining what arrangements (other than the Parallel C, ESOP/S and Roth/S structures) are within the scope of the injunction," and that this amounts to an unconstitutional delegation of Article III power to a nonjudicial officer.

Stover misunderstands this paragraph of the injunction. Paragraph two merely requires IRS approval before Stover organizes, sells, or promotes any new tax

-20-

avoidance schemes. If the IRS does not give approval and Stover nevertheless believes his scheme comports with § 7408 and other tax laws, he can move the district court to modify the injunction or to specify that certain conduct is not prohibited. And if the IRS were to fail to respond to any of Stover's proposed schemes within the 30 day window of the provision, the injunction authorizes Stover to implement the scheme, subject to any later review by the IRS. We agree with the government that requiring Stover to notify the IRS of any new proposed tax avoidance arrangements is a reasonable requirement in light of his habit of promoting tax fraud schemes and attempting to avoid IRS detection. Both this court and others have upheld similar provisions in the past. See Davison, 2010 WL 1935951, at *17 (requiring Stover's former business partner to notify an IRS designee of new clients and entities for whom he provided tax advice), aff'd, 407 F. App'x at 997; Campbell, 897 F.2d at 1323 (requiring promoter of abusive tax scheme to provide the IRS notice of intent to organize or sell any new tax shelter and to wait 30 days before promoting or selling it). Paragraph two of the injunction is not an impermissible delegation of Article III authority.

V.

Stover finally argues that the district court's injunction is an unconstitutional prior restraint of otherwise protected speech. Given the "heavy presumption" against prior restraints, Kaun, 827 F.2d at 1150, Stover argues that the injunction does not pass constitutional muster, especially since it is not expressly limited to a prohibition on making false or misleading commercial statements.

The government responds that Stover waived this argument since he failed to raise any First Amendment issues below. See, e.g., Campbell v. Davol, Inc., 620 F.3d 887, 891 (8th Cir. 2010) ("It is old and well-settled law that issues not raised in the trial court cannot be considered by this court as a basis for reversal."). In reply, Stover

argues that the present appeal is the "first reasonable opportunity" he has had to raise the First Amendment challenge, given that he "was not presented with the contours of the present injunction" until after it was issued.

Stover's assertions do not comport with the record. In its complaint, the government sought extremely broad injunctive relief, including much of the relief in the district court's permanent injunction. In fact, the government even sought to enjoin Stover from "aiding, assisting, and/or advising with respect to the preparation of any federal tax return or representing customers before the IRS." The district court wisely recognized that such a lifetime prohibition on performing any tax preparation services would have posed more serious First Amendment problems and chose not to include that provision. Yet Stover's trial brief never raised any First Amendment concerns. We conclude that he waived this issue. See Davol, Inc., 620 F.3d at 891.

Even if Stover had not waived his First Amendment objections, they would be foreclosed by circuit precedent. We held in White that the First Amendment "does not protect commercial speech which promotes an illegal activity or transaction," and affirmed the district court's permanent injunction in that case. 769 F.2d at 516–17. Stover's various tax schemes were "not only completely misleading, but [they] also promoted tax evasion and abusive tax avoidance." Id. at 517. We thus join every other appellate court to consider the issue in holding that injunctions narrowly tailored to restrict false or fraudulent commercial tax advice do not violate the First Amendment. See, e.g., Benson, 561 F.3d 718, 725–27 (7th Cir. 2009); Schulz, 517 F.3d 606, 607–08 (2d Cir. 2008); Bell, 414 F.3d 474, 481–84 (3rd Cir. 2005); Schiff, 379 F.3d 621, 630–31 (9th Cir. 2004); Campbell, 897 F.2d 1317, 1323 (5th Cir. 1990). See generally Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 563–64 (1980).

## VI.

For the foregoing reasons, the judgment of the district court is affirmed.

_____