T.C. Memo. 2020-58

UNITED STATES TAX COURT

ALLEN R. DAVISON, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14765-15L.                    Filed May 14, 2020.

Allen R. Davison, pro se.

<u>Rachael J. Zepeda</u>, <u>Derek S. Pratt</u>, <u>Alicia E. Elliott</u>, and <u>Trisha S. Farrow</u>,

for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, <u>Judge</u>:  This case is before the Court on a petition for review of a

Notice of Determination Concerning Collection Action(s) Under Section(s) 6320

[*2] and/or 6330 (notice of determination).[1]  After concessions by the parties,[2] the

primary issue for decision is whether petitioner is liable for a penalty under section

6700 of $18,000 for each of tax years 2009 and 2010 (years at issue), $36,000 in

total.

FINDINGS OF FACT

Some of the facts are stipulated and are so found.  The stipulation of facts

and the attached exhibits are incorporated herein by this reference.  Petitioner,

Allen R. Davison, resided in Kansas when the petition was filed.  This case was

consolidated for trial with the case of Lemay v. Commissioner, docket No. 19356-

15L.  Our opinion in Lemay may be found at T.C. Memo. 2020-59.

I.    Background

Petitioner graduated from the University of Nebraska in 1973, where he

earned a bachelor of science degree in business administration.  Petitioner

obtained a law degree from the University of Nebraska in 1979 and was admitted

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue.  All monetary amounts are rounded to the nearest dollar.

[2]Respondent and petitioner proceeded as if the question of petitioner's underlying liability is appropriately before this Court, with the primary issue for decision being whether petitioner is liable for promoter penalty under sec. 6700. Since both parties proceeded as though the underlying liability is in dispute, we will follow their lead.

[*3] to practice law in Nebraska in 1979. Petitioner became a certified public accountant (C.P.A.) in 1981 and was licensed in Nebraska, Kansas, and Missouri.[3] From 1979 to 1993 petitioner worked for the accounting firm Coopers and Lybrand. From 1993 to 2001 petitioner worked for the accounting firm Grant Thornton as a tax partner. In this role petitioner worked on tax matters for clients under audit. Petitioner first met Bruce Lemay in a professional setting. They became friends and have maintained that friendship.

While working in the insurance industry Mr. Lemay came to learn of "tool plans".[4] A former colleague requested Mr. Lemay's assistance in calculating, or otherwise determining, how an employer's participation in a tool plan affected that employer's worker's compensation insurance premiums. Mr. Lemay responded that he was unfamiliar with tool plans, but he researched this issue and found that an employer's participation in a tool plan had no effect on the calculation of the employer's worker's compensation premiums. Mr. Lemay reported these findings to his former colleague.

---

[3]Petitioner is no longer a licensed C.P.A. in Nebraska, Kansas, or Missouri.

[4]"Tool plans" generally attempt to operate to bifurcate an employee's wages into a taxable labor portion and a nontaxable portion relating to tool expense reimbursement.

**[*4]** While researching tool plans Mr. Lemay discovered a tool plan company called ProCheck and began to foster a relationship with its president. Mr. Lemay and ProCheck's president discussed tool plans generally, as well the tax aspects thereof. The president of ProCheck offered Mr. Lemay the opportunity to join ProCheck. Mr. Lemay sought the advice of petitioner, who held reservations about ProCheck's operations and the purported benefits its tool plans offered. After being apprised of the details of ProCheck, petitioner validated Mr. Lemay's concerns, and advised him to decline ProCheck's offer. Although Mr. Lemay declined the offer to join ProCheck, Mr. Lemay and the president of ProCheck agreed to form a new company that would promote tool plans, so long as such plans were reviewed and approved by petitioner and his employer, Grant Thornton.

## II.    Organization of CMS

On September 29, 1999, Mr. Lemay, along with the president of ProCheck and two other individuals affiliated with ProCheck, organized Cash Management Systems (CMS), an S corporation, in the State of Virginia.

From 1999 to 2010 petitioner was the key legal and tax planning adviser to CMS. Immediately after organizing, CMS formally engaged petitioner, and through him Grant Thornton, to consult and advise CMS regarding the tax benefits

[*5] of its proposed tool plan products. Petitioner's first task was to review the details of the tool plans CMS intended to market. Petitioner managed the CMS client account for Grant Thornton until he left the firm in 2002. On November 20, 2002, petitioner began serving on CMS' board of directors. Petitioner was placed on retainer with CMS for six months during 2008 and all of 2009 and 2010. During 2009 and 2010 CMS paid petitioner $3,000 per month for his services.

Mr. Lemay organized Xell Enterprises, Inc. (Xell), as an S corporation in Kansas on April 26, 1999, to operate his own sales-consulting business. After CMS was organized, however, Xell's primary purpose became marketing and selling CMS' tool plans.

III. Development of the Tool Program

CMS had three different tool plans in its Tool Program: (1) the existing tool plan, (2) the new tool plan, and (3) the tool use plan. CMS planned to operate the tool plans in sequence in order to maximize the lifetime tax savings for both the employees and employers that would choose to enroll with CMS. In addition to the tool plans and payroll administration, CMS offered legal research and free audit representation as part of an overall employee benefits package. The tool plans, administrative support, and audit representation collectively constituted the Tool Program.

[*6]   CMS designed its tool plans to allow both employers and employees to claim substantial tax savings by bifurcating an employee's base pay into a taxable labor portion and a nontaxable portion for tool reimbursement or use.  This bifurcation was based upon a proprietary formula.  CMS promised the avoidance of Federal income tax withholding, employment taxes, or both, depending on the tool plan.[5]  The maximum tool reimbursement or use pay per pay period was 35% of the participating employees' wages.  CMS made money from fees charged for administering the tool plans.  Upon enrolling both an employer and its employees, CMS administered the enrolled employer's payroll and issued associated statements.  Through those associated statements, CMS regularly kept employers and client-employees abreast of the claimed tax savings from CMS tool plans.

A.    The Existing Tool Plan

Under the existing tool plan, an employer recharacterized a portion of each employee's base pay as a reimbursement to that employee for the cost of tools acquired by that employee before enrolling in the plan.  The employees were reimbursed in amounts reflecting the acquisition costs of their tools, rather than

---

[5]We use the term "employment taxes" to refer to taxes under the Federal Insurance Contributions Act (FICA) and the Federal Unemployment Tax Act.  See Weber v. Commissioner, 138 T.C. 348, 357 (2012); Stevens Techs., Inc. v. Commissioner, T.C. Memo. 2014-13, at *27-*29; Otto's E-Z Clean Enters., Inc. v. Commissioner, T.C. Memo. 2008-54, slip op. at 2 n.2.

**[*7]** the replacement costs or the fair market value costs, before enrollment in the existing tool plan.[6] CMS calculated the appropriate tax withholdings for each employer's labor pay, but not tool pay, and remitted this information to the employer. The employer withheld the necessary taxes for the labor pay portion but did not withhold taxes for the tool portions determined by CMS. CMS claimed that the existing tool plan was an accountable plan under section 62, whereby reimbursement paid to employees for the cost of their own tools used on a job was not considered wages for employment tax purposes.

### B.    The New Tool Plan

The new tool plan also recharacterized a portion of each employee's base pay as a nontaxable reimbursement. The only meaningful difference between the existing tool plan and the new tool plan was that, under the new tool plan, employees were reimbursed only for tools purchased after their enrollment. Otherwise, the bifurcation of an employee's base pay operated in an identical manner. The new tool plan also purported to be an accountable plan under section 62.

---

[6]CMS determined the cost of an employee's tool inventory by reference to an estimate of what the employee had originally paid for those tools rather than the current replacement cost.

**[*8]** C.     <u>The Tool Use Plan</u>

Once an employee was treated as reimbursed for the cost of his or her tool inventory under the existing and/or new tool plans, CMS transitioned the client employee to the tool use plan. CMS offered the tool use plan to allow an employee to charge his or her employer a fee for the rental of the employee's tools during the daily course of the employee's labor. Similarly to the other plans, the employee's base wage was recharacterized into a taxable portion for labor wages and a tax-exempt portion for rental fees. CMS did not claim the tool use plan was an accountable plan and accordingly agreed that the rental fees paid pursuant to the plan were subject to Federal income taxation. CMS did claim, however, that the rental fees paid pursuant to the tool use plan fell outside the employment tax definition of wages and thereby reduced the employment tax liability of the employer and the employee. The tool use plan was available to any employee enrolled in the CMS tool plans, including those treated as fully reimbursed for the stated value of their tools under the reimbursement plan, or any employee who was treated as having fully depreciated the cost of his or her tools before enrollment in the plan. CMS calculated the tool usage amount for each participating employee and reported the amount to the employer so that the employee could be paid accordingly. CMS issued a Form 1099-MISC, Miscellaneous Income, to each

[*9] client-employee reflecting amounts paid under the use plan. All payments to those employees came from their employer directly, and they would also receive a Form W-2, Wage and Tax Statement, from their employer reflecting their labor pay.

IV.    Initial Review of the Tool Plans

Petitioner agreed to review the CMS tool plans and their proposed administration. Petitioner advised that securing a private letter ruling from the Internal Revenue Service (IRS) was critical to ensure the viability of the tool plans. In order to better understand the prospects of securing a favorable private letter ruling, petitioner and Mr. Lemay sought the advice and counsel of Tom Ochsenschlager, a partner at Grant Thornton's national tax office in Washington, D.C. Mr. Lemay and petitioner provided Mr. Ochsenschlager with relevant information on CMS and the tool plans it intended to offer.

Through a series of communications occurring in November 1999, Mr. Ochsenschlager informed petitioner and Mr. Lemay that there was little chance of securing a favorable private letter ruling from the IRS with respect to the CMS tool plans. Mr. Ochsenschlager spoke with attorneys from the IRS and advised petitioner and Mr. Lemay that the IRS believed that the tool plans failed to comply with the law applicable to accountable plans. Mr. Ochsenschlager stated that the

[*10] tool plans allowed for reimbursements to employees in amounts exceeding their out-of-pocket expenses for the year, contravening the statutory requirements for accountable plans. Further, Mr. Ochsenschlager indicated that the IRS believed that the tool use plan lacked economic substance, that there was limited legal authority supporting tool reimbursement plans generally, and that the IRS had an interest in litigating against taxpayers promoting tool reimbursement plans such as those proposed by CMS.

Petitioner and Mr. Lemay subsequently met to determine how best to bring the CMS Tool Program to market in the light of Mr. Ochsenschlager's concerns. To that end, on December 2, 1999, petitioner and Mr. Lemay met and developed the following plan of action: (1) CMS would aggressively proceed in marketing its three separate tool plans; (2) petitioner would draw up a document on behalf of Grant Thornton endorsing the Tool Program (Grant Thornton's justification paper); (3) petitioner, along with Mr. Lemay, would be included in marketing the tool plans to targeted clients; (4) petitioner would train Mike East, an employee of Xell, on the tax aspects of the Tool Program, and Mr. East would then train CMS' sales agents on the tax aspects of the Tool Program; and (5) training dates for sales agents, dates for commencing sales calls, and the establishment of sales targets would be set.

**[\*11]** During that meeting petitioner and Mr. Lemay agreed that the new tool plan and the existing tool plan would be promoted as accountable plans but that the tool use plan was not an accountable plan and payments made thereunder would instead be properly characterized as incidental rental payments. Petitioner and Mr. Lemay also agreed that Grant Thornton's justification paper should serve to clearly establish that the only risk of enrolling in the new tool plan and the tool use plan is payment of additional tax and that neither plan carried the risk of penalties or prosecution. Petitioner was aware that the existing tool plan was aggressive and bore the risk of penalties, and this awareness led him to omit the existing tool plan from Grant Thornton's justification paper. Nevertheless, petitioner and Mr. Lemay resolved to aggressively market the existing tool plan.

In a letter dated December 6, 1999, Mr. Lemay wrote an associate at Grant Thornton who assisted petitioner with CMS matters generally. In that letter, for purposes of memorializing his meeting with petitioner, Mr. Lemay offered specific instructions about what information he wanted included in Grant Thornton's justification paper. Mr. Lemay requested that Grant Thornton's justification paper address the tax regulations and cases that demonstrated the validity and compliance of the new tool plan with accountable plan rules. Additionally, Mr. Lemay requested that Grant Thornton's justification paper document the tax cases

**[\*12]** and regulations supporting the position that payments under the tool use plan were not subject to employment taxes. Further, Mr. Lemay requested that Grant Thornton refrain from discussing the existing tool plan in its justification paper but suggested that its risks should be discussed with prospective clients in person.

Petitioner wrote and finalized Grant Thornton's justification paper dated February 12, 2000, and delivered it to CMS. In accordance with Mr. Lemay's instructions, Grant Thornton's justification paper did not address the existing tool plan but discussed only the new tool plan and the tool use plan. Grant Thornton's justification paper concluded that the new tool plan qualified as an accountable plan and was therefore exempt from employment taxes and that the potential for a penalty imposed under section 6672 was limited. The paper also concluded that payments to employees under the tool use plan would be unlikely to withstand IRS scrutiny for an accountable plan but that there was a "long line of authority" that such payments should be treated as exempt from self-employment tax. The paper further concluded that if the IRS audited returns of an employer enrolled in the tool use plan and payments made thereunder were recharacterized as wages, the consequence would be possible examination, collection, and submission of employment taxes and interest.

[*13] Petitioner also drafted an executive summary of Grant Thornton's justification paper dated February 11, 2000, for distribution to clients and potential clients of CMS. Petitioner drafted the executive summary because CMS advised petitioner that its clients likely did not want to read the full opinion but would prefer an abridged version. The executive summary concluded that the "reimbursement plan for the cost of the employee's tools qualifies as an accountable plan under [section] 62(a)(2)(A)." That summary also concluded that "there is a long line of authority leading to the conclusion that the usage payments under CMS's plan should be treated as other income not subject to the self-employment tax."

In both Grant Thornton's justification paper and petitioner's executive summary, petitioner emphasized that the legal positions taken on the Tool Program were supported by "substantial authority". Petitioner's executive summary did not include a definition of substantial authority or discuss the likelihood that the plans would fail under IRS scrutiny. Neither Grant Thornton's justification paper nor the executive summary emphasized that the legal positions on the purported tax benefits available under the Tool Program were supported by "substantial authority" as the term was understood by petitioner and Mr. Lemay-- that the tool plans had a 33.5% chance of withstanding an IRS attack. Further,

[*14] petitioner's executive summary did not address or express confidence in the lawfulness of the existing tool plan, despite the fact that CMS marketed its three tool plans simultaneously. Grant Thornton's justification paper and petitioner's executive summary were distributed to clients and potential clients of CMS. Petitioner was aware that Grant Thornton's justification paper was distributed to clients and potential clients of CMS.

Following CMS' receipt of Grant Thornton's justification paper, Mr. Lemay determined that the tool plans were ready to market and delivered a presentation to the CMS board of directors indicating as much. The CMS board of directors approved the tool plans, sales strategy, and marketing materials developed by petitioner and Mr. Lemay. CMS began marketing and administering the tool plans immediately thereafter.

V.    Marketing the Tool Plans

A.    The Sales Pitch

Because the tool plans aimed to provide tax savings to employers and employees, CMS needed both parties to enroll in the Tool Program. The first step in the CMS strategy was to enroll employers whose employees were required to furnish their own tools. In general this meant marketing to employers in the heating, ventilation, and air conditioning industry, as well as the automotive and

[*15] trucking industries.  Once CMS successfully enrolled an employer (client-employer), the next step was to enroll that employer's employees (client-employees).

      1.     Employers

The sales process would typically begin when sales agents, who were trained and managed by Mr. Lemay, identified a potential client-employer.  Once a potential client-employer was identified, Mr. Lemay or a sales agent would meet with the client-employer and deliver a presentation on the Tool Program.  During the presentation, Mr. Lemay and the sales agents relied on the marketing strategy and materials that petitioner developed alongside Mr. Lemay.  CMS relied on the legal positions petitioner expressed in Grant Thornton's justification paper to develop its marketing materials.  Petitioner reviewed the marketing materials that CMS gave to its clients.

CMS' marketing materials included a slide show and informational flyers that provided an overview of the purported tax savings of CMS' three plans.  As a general matter, these materials emphasized the Tool Program's compliance with relevant laws.[7]  The materials emphasized petitioner's conclusion that Grant

---

[7]At a presentation to a potential client in 2008 CMS advertised that CMS' "unequaled experience has resulted in the successful examination of our program."

(continued...)

[*16] Thornton's support of the program virtually eliminated any tax liability or risk of penalties, that CMS maintained full compliance with IRS guidelines, and that CMS' reimbursement plans met the accountable plan requirements under section 62. These materials broadly described the tool plans as a "no net cost" employee benefit that funded an increase in employee take-home pay while also boosting an employer's bottom line. The marketing materials failed to clarify to potential clients how petitioner's positions on the purported tax benefits available under the Tool Program were supported by "substantial authority" and what exactly that term meant.

The materials Mr. Lemay provided to potential clients represented that the CMS tool plans had been "tested and accepted", successfully examined, and found to comply with tax law requirements. Further, these materials emphasized that Grant Thornton would represent the client in the event of an IRS audit, at no cost. If prospective or current client-employers had tax questions, petitioner was available to speak with them. Petitioner did in fact speak with prospective clients on the tax aspects, and these conversations often resulted in enrollment.

---

[7](...continued)
At the time this statement was made, the IRS had not completed an audit of any of CMS' clients' returns.

**[*17]** Petitioner, individually, was held out in marketing materials as the legal expert on the Tool Program.

### 2. Employees

Although an employee's participation in the tool plan was voluntary, the employee's attendance at a CMS or Xell sales presentation was mandatory. Mr. Lemay pressured client-employers to maximize employee participation in enrollment on the grounds that it would foster a better employee and employer relationship and promote greater savings for the employer. When the Tool Program was met with concern or skepticism by employees, Mr. Lemay often recommended a one-on-one meeting to explain "why their fear is not accurate." During such meetings Mr. Lemay or a sales agent aimed to provide the concerned employee with a "more accurate insight" into the program and its benefits.

The marketing materials directed toward the prospective client-employees also emphasized that the tool plans offered an increase in an employee's take-home pay. The decision to enroll in the full suite of tool plans was presented as simple as the decision to pick up a $20 bill on the ground. These marketing materials, however, did not disclose the level of risk involved with participating in a CMS plan. Mr. Lemay instructed client-employees who received conflicting

[*18] advice from an independent tax adviser regarding the Tool Program's legal compliance to contact CMS in order to resolve any discrepancies.

B.      Postenrollment Procedure

After enrolling, a client-employer executed an agreement to pay CMS fees for its administration of the Tool Program. CMS would then coordinate with the client-employer to establish a timeline for enrolling employees and implementing the Tool Program. Once this timeline was set, CMS would turn its attention to marketing the Tool Program to the employees.

Although employees could enroll in one or more of the three tool plans, approximately 90% of all client-employees enrolled in all three. If a client-employee enrolled in all three tool plans, the first step was his or her completion of an enrollment form for submission to CMS. At the request of Mr. Lemay petitioner reviewed the instructions provided on the enrollment form. The enrollment form included a chart organized by different categories of tools with corresponding spaces for the client-employee to list the acquisition costs of all the tools he or she owned at the time of enrollment. Client-employees were encouraged to include as many tools as possible in determining the total acquisition costs of their tools, even if some of those tools were not required for their employment with the client-employer.

[*19] CMS explicitly instructed client-employees not to state the replacement costs or the fair market values of their tools on the enrollment forms. If employees did not have records of the acquisition costs of their tools, they were instructed to estimate the original costs and write those amounts on the enrollment forms. The enrollment forms instructed client-employees to enter these estimated costs under a space for "miscellaneous" tools, without listing each separate tool or its cost. The enrollment forms also instructed client-employees to answer a yes or no question as to whether they had depreciated or expensed any of their tools, and, if so, how much in total. Until 2007 client-employees were not formally required to provide either receipts supporting the acquisition costs stated on the enrollment forms or to list the dates they purchased their tools. In 2007 CMS asked prospective clients and current clients to provide receipts along with their tool inventories; however, CMS did not enforce this requirement. The marketing materials emphasized the importance of accurate record substantiation in accordance with the accountable plan rules. However, no one from CMS or Xell was responsible for verifying that the stated acquisition costs for employees' tools were, in fact, accurate.

The sum total of the client-employee's acquisition costs for the tool inventory was tracked as the employee's base for reimbursement for the duration

[*20] of his or her enrollment in the existing tool plan. Under the existing tool plan CMS characterized a fixed percentage of each client-employee's gross wages in each pay period as a partial reimbursement for the value of his or her tool inventory and paid that amount each pay period until the client-employee was fully reimbursed for the tool inventory. CMS' practice of encouraging client-employees to list as many tools as possible had the effect of greatly inflating the employees' bases for reimbursement, and therefore increased both the purported tax savings and the fees received by CMS.

CMS operated the new tool plan in a manner similar to the existing tool plan. Under the new tool plan, when a client-employee purchased a new tool, he or she would report the purchase and cost to CMS, and that tool and its value would be added to the client-employee's tool inventory and treated as reimbursed in the same manner as the preexisting tool inventory.

Once a client-employee was reimbursed for the cost of his or her tool inventory by way of the existing or new tool plans, CMS would transition the client-employee to the tool use plan. Under that plan CMS categorized a portion of the client-employee's base pay as tool rental fees, in a proportion determined by applying a CMS-developed formula against the total value of the client-employee's tool inventory.

**[\*21]** VI.   <u>Professional Advice Regarding the Tool Program and Marketing Materials</u>

A.   <u>Crowe Chizek</u>

After Mr. Ochsenschlager of Grant Thornton's national tax office concluded that there was little to no chance of securing a favorable IRS private letter ruling with respect to the Tool Program, petitioner and Mr. Lemay actively sought a second opinion. Mr. Lemay contacted the accounting firm Crowe Chizek (Crowe) to inquire about CMS' prospects of securing a favorable private letter ruling. Mr. Lemay provided Crowe with a copy of Grant Thornton's justification paper for Crowe's evaluation.

On October 9, 2000, Robert Zwiers of Crowe wrote a letter (Crowe opinion) to Mr. Lemay with Crowe's analysis of Grant Thornton's justification paper. Grant Thornton's justification paper did not include an analysis of the existing tool plan. Accordingly, the Crowe opinion did not discuss the existing tool plan. The Crowe opinion stated that Grant Thornton's justification paper provided insufficient information for Crowe to determine whether the new tool plan met the requirements for an accountable plan. The Crowe opinion stated that the IRS had recently withdrawn a private letter ruling where it had concluded that payments made under an accountable plan were not subject to Federal employment taxes.

[*22] The Crowe opinion stated that it was possible the conclusion reached in that private letter ruling could negatively affect the availability of tax benefits under the new tool plan. As to the tool use plan the Crowe opinion stated that "there does not appear to be any authority for * * * [petitioner's and Mr. Lemay's] conclusion" that payments made thereunder were not subject to Federal employment taxes. Further, the Crowe opinion stated that there was no support for treating payments to employees, in their capacity as employees, as exempt from Federal employment taxes unless made under an accountable plan. The Crowe opinion concluded that there appeared to be little support, if any, for the position that payments under the tool use plan should be exempt from Federal employment taxes.

Mr. Lemay did not accept the advice in the Crowe opinion. Rather, he asked petitioner to draft a response to the Crowe opinion on behalf of Grant Thornton in which petitioner disputed that advice. In a letter dated November 1, 2000, petitioner responded to the Crowe opinion and sent the response to Mr. Lemay. Petitioner's letter concluded that the Crowe opinion incorrectly stated that there was insufficient information to determine whether the requirements of an accountable plan were met in the new tool plan. Petitioner also concluded that, although there was not any caselaw specifically addressing usage payments under

[*23] a plan similar to the tool use plan, the plan was in compliance with all relevant law. Petitioner and Mr. Lemay's support of the Tool Program was unaffected by the Crowe opinion. CMS made no changes to the Tool Program after the Crowe opinion.

B.    McDermott Will & Emery

Mr. Lemay also contacted the law firm of McDermott, Will & Emery (McDermott) regarding the Tool Program. In addition to the new tool plan and tool use plan, Mr. Lemay sought McDermott's opinion on the existing tool plan, which was not addressed in Grant Thornton's justification paper. McDermott sent Mr. Lemay a memorandum dated June 1, 2001, written by tax attorneys David Fuller and Janie Cook. Petitioner also received a copy of this memorandum. McDermott stated therein that tool reimbursement plans were the subject of increased scrutiny because the IRS had placed employer reimbursement programs on its Priority Guidance Plan. McDermott's memorandum warned that the existing tool plan would likely fail the accountable plan requirements. McDermott explained that the IRS would not allow CMS to reimburse client-employees for expenses incurred before the employees' current employment. McDermott advised that the new tool plan was "the strongest component of the * * * [Tool Program] under the accountable plan rules" but also noted that aspects of that plan

[*24] needed to be modified in order to comply with accountable plan rules. Specifically, the new tool plan would likely run afoul of the business connection component of the accountable plan rules if CMS operated a plan in which a client-employer paid its employees the same weekly amount whether or not the employees incurred business expenses.

McDermott confirmed petitioner's conclusion that the tool use plan would probably fail the accountable plan requirements. McDermott concluded that if the tool use plan failed the accountable plan rules, there was no support for the position that payments made under the tool use plan were exempt from Federal employment taxes. McDermott also warned petitioner that operating the three tool plans in tandem greatly increased the risk of losing in an IRS audit. This is because "an independent party bargaining at arm's length would not agree to both pay for buying the * * * [employee's tools and equipment] and then pay for using the * * * [tools and equipment], unless the latter payment was only intended to cover maintenance and related continuing costs."

McDermott offered a number of recommendations for bringing the Tool Program into legal compliance. McDermott recommendations included, but were not limited to, the following: (1) that CMS offer only the combined Tool Plans where expense reimbursements would be for the value of the use of tools and

[*25] equipment attributable to ongoing maintenance, insurance and inventorying costs; (2) that CMS enforce a salary reduction if the employee failed to incur or substantiate tool expenses for any given payroll period; (3) that for the existing tool plan, CMS ensure all eligible expenses were incurred within a year; (4) that expenses had not been incurred in the capacity of independent contractor and had not been previously reimbursed, deducted, or depreciated; and (5) that expenses have been incurred for tools that would be used to perform services for the employer.

After Mr. Lemay received McDermott's memorandum, petitioner and Mr. Lemay scheduled a meeting with the McDermott attorneys who had drafted it. Before that meeting Mr. Lemay sent petitioner an email asking how CMS ought to modify the existing tool plan in the light of the fact that McDermott's memorandum cited a private letter ruling in which the IRS had disallowed reimbursement of the acquisition costs of tools purchased before an employee's tenure with his or her current employer. Despite petitioner's knowledge that McDermott recommended changes be made to the existing tool plan to bring it into compliance, petitioner did not modify Grant Thornton's justification paper. Further, CMS made no changes to the Tool Program as a result of McDermott's memorandum.

[*26] C.     Grant Thornton's Disavowal of CMS and the Tool Program

On April 15, 2001, petitioner gave Grant Thornton his resignation letter effective October 15, 2001.  Petitioner left Grant Thornton to pursue another full-time job with the National Association of Independent Truckers, which offered him a more flexible work schedule.  Petitioner continued to work with and on behalf of CMS after leaving Grant Thornton.

In a letter received by Mr. Lemay dated June 26, 2002, Grant Thornton demanded that CMS stop using Grant Thornton's name in marketing the Tool Program.  The letter was written by Robert P. Scales, associate general counsel for Grant Thornton.  In that letter Mr. Scales also advised that CMS did not have permission to distribute copies of correspondence and memoranda from Grant Thornton for purposes of marketing the Tool Program.  Further, Mr. Scales insisted that CMS clarify with its existing and potential clients that Grant Thornton did not endorse the Tool Program.

Mr. Lemay responded to Grant Thornton with a letter dated July 22, 2002.  Mr. Lemay wrote the letter in order to salvage the relationship between Grant Thornton and CMS.  In this letter Mr. Lemay defended CMS' use of Grant Thornton's name in its marketing materials on the ground that the positions CMS had taken regarding the new tool plan and the tool use plan were made with the

[*27] knowledge and agreement of petitioner and Mr. Ochsenschlager.[8] Petitioner requested that Grant Thornton provide updated feedback on the tool plans, or alternatives to bring CMS' positions current.

Grant Thornton responded to petitioner in a letter dated August 15, 2002, reiterating that no position or alternative argument could be made to support the tool use plan. Grant Thornton clarified that a reimbursement plan is either accountable and thereby exempt from employment taxes or nonaccountable and subject to both income and employment taxes. Grant Thornton demanded that CMS no longer market the tool use plan and stop listing its name on marketing materials. Further, Grant Thornton advised that Rev. Rul. 2002-35, 2002-1 C.B. 1067, effectively rendered moot petitioner's argument that a tool reimbursement plan may be nonaccountable and nonetheless avoid employment taxes.[9]

---

[8]Mr. Ochsenschlager repudiated Mr. Lemay's assertion that the positions CMS had taken regarding the tool program were made with his knowledge and agreement. Mr. Ochsenschlager recalled that his "conclusion was negative" with respect to the tool plans he reviewed--the new tool plan and the tool use plan. Mr. Ochsenschlager commented that, on both occasions when he had met with petitioner and Mr. Lemay to discuss the Tool Program, he expressed no optimism that the tool use plan would pass muster with the IRS. Mr. Ochsenschlager stated that the new tool plan could probably be supported if it essentially expensed small tool purchases, but he regarded the tool use plan as the "bread and butter of CMS."

[9]The facts and ruling in Rev. Rul. 2002-35, 2002-1 C.B. 1067, dealt with pipeline welders and equipment mechanics. The mechanics were employees who

(continued...)

[*28] Following receipt of Grant Thornton's letter dated August 15, 2002, Mr. Lemay understood that CMS no longer had the support of Grant Thornton. Despite Mr. Lemay's knowledge that clients enrolled in the Tool Program under the assumption that it was supported by Grant Thornton, CMS failed to notify any of its client-employers or client-employees that Grant Thornton no longer supported the Tool Program. Although CMS' relationship with Grant Thornton terminated in 2002, some clients that enrolled before that time continued to believe that Grant Thornton was responsible for their audit defense until as late as 2011.

D.    Petitioner's Response to Grant Thornton's Disavowal

In response to Grant Thornton's disavowal of its relationship with CMS, Mr. Lemay requested that petitioner draft a series of memoranda in support of the Tool Program. First, petitioner drafted a memorandum dated July 24, 2002, concluding that a number of tax theories supported the conclusion that the existing tool plan met the business connection requirement of the accountable plan rules.

---

[9](...continued)
also provided equipment to the employer, and they received a separate payment for use of the equipment. The ruling held that the payments were subject to both income and employment taxes. The ruling also stated that "[i]f an arrangement does not satisfy one or more of * * *[the accountable plan] requirements," all of the amounts paid under the arrangement would be paid under a nonaccountable plan. Id., 2002-1 C.B. at 1068.

[*29] Petitioner also stated that client-employees ought to be allowed deductions for the costs of any existing tools used on the job and that such expenses constituted ordinary and necessary business expenses. Petitioner reasoned that employees entered into a new business with respect to their existing tool inventory by enrolling in the CMS Tool Program and that this conversion opened the doorway to ordinary and necessary business deductions with respect to the cost of those tools. Petitioner understood that client-employees might have purchased their tools several years before participating in the existing tool plan. Further, petitioner understood that client-employees did not hold themselves out as being in a new or different trade or business by virtue of their enrollment in the CMS Tool Program.

Petitioner's memorandum did not address whether tools unnecessary for a job, or tools used outside of work, were eligible for reimbursement under the accountable plan rules. Petitioner knew that an employee's expense incurred for an unnecessary tool "murkies the water" as to whether it qualifies as an ordinary and necessary business expense. Mr. Lemay promoted petitioner's memorandum dated July 24, 2002, in selling the Tool Program.

Petitioner also drafted a memorandum dated October 10, 2002, which did not discuss the existing tool plan. This memorandum concluded that "substantial

[*30] authority" supported the new tool plan's qualification as an accountable plan. Petitioner's opinion expressly defined "substantial authority" as a 33.5% chance of prevailing if returns were examined by the IRS. This memorandum also concluded that payments made under the tool use plan were not subject to self-employment or payroll taxes, but it did not directly conclude that substantial authority existed for this position. Petitioner reasoned that since the client-employee was not in the trade or business of renting tools or equipment, rental payments made under the use plan were not subject to self-employment tax. Petitioner drafted this memorandum knowing it would be distributed to clients. Petitioner was aware that Grant Thornton had rescinded its support of the Tool Program when he drafted his memorandum dated October 10, 2002. That memorandum did not address potential issues that might arise from using the three tool plans together.

Petitioner created an executive summary of his memorandum dated October 10, 2002, on November 22, 2002. Petitioner was asked to draft this executive summary for marketing purposes, and CMS did in fact use it for marketing purposes.

In the executive summary dated November 22, 2002, the existing tool plan was mentioned only once. Petitioner wrote: "[A] variation of * * * [the new tool]

[*31] plan may allow employees to substantiate the cost of their existing tools when they initially enroll in the plan to take advantage of tax benefits of reimbursement for existing tools without income tax or employment taxes." Further, petitioner asserted that both the new tool plan and the tool use plan were supported by "substantial authority" and that in the event of an audit, CMS would provide audit support at no cost. In direct contrast with Grant Thornton's reading of Rev. Rul. 2002-35, supra, petitioner did not believe reimbursement plans must meet the accountable plan requirements in order to avoid employment taxes.[10] Mr. Lemay used this executive summary to help sell the tool plan and to train CMS and Xell sales agents in marketing the Tool Program.

E.   KPMG's Opinion on the Tool Program

Following Grant Thornton's disavowal of the Tool Program, Mr. Lemay sought to bolster the reputation of CMS and the Tool Program by obtaining support from another independent tax firm. Mr. Lemay also wanted another opinion on the likelihood of obtaining a favorable IRS private letter ruling. To

_____

[10]Petitioner concluded that the technical aspects of the CMS tool use plan were not addressed by Rev. Rul. 2002-35, supra. Petitioner then concluded that the IRS tacitly acknowledged that payments for use of property might constitute rent. He grounded these conclusions on his reading of a 2001 field service advice, FSA 200127004, which he believed allowed for usage payments that were not considered wages for the employment tax purposes, regardless of whether such payments were made under an accountable plan.

[*32] that end, Mr. Lemay contacted to KPMG's Wichita office (KPMG) and requested its review and opinion of petitioner's memorandum dated October 10, 2002. On April 3, 2003, CMS received KPMG's opinion on the Tool Program. There was no discussion of the existing tool plan in KPMG's opinion.

KPMG advised that the tool use plan failed to meet the accountable plan rules and advised that Rev. Rul. 2002-35, supra, did not permit alternate characterizations of payments made to employees. Accordingly, KPMG advised that payments made to employees be characterized as wages for services rendered, accountable plan reimbursements, or nonaccountable plan reimbursements. Further, KPMG stated that nonaccountable plan payments were treated as additional wages, and employee payments not made under an accountable plan were subject to income taxation and employment taxation. KPMG noted that there was no direct or indirect support for bifurcating wages as contemplated under the tool use plan.

KPMG concluded that the new tool plan appeared to meet the requirements of an accountable plan but noted that each employer should be encouraged to adopt formal, written personnel policies providing conditions for reimbursement consistent with the accountable plan requirements. The record does not reflect CMS' having encouraged its clients to do this. Further, no changes were made to

[*33] the Tool Program in the light of KPMG's opinion, and CMS did not distribute it to clients.

F.      Further Opinions by Petitioner and a Second Try With McDermott

In 2005 Mr. Lemay requested that petitioner write another opinion for CMS, as well as an executive summary of that opinion, in the light of the IRS' then-recent release of Rev. Rul. 2005-52, 2005-2 C.B. 423.  That ruling concluded that tool allowances paid to employees were not paid under an accountable plan because the substantiation and return of excess requirements were not met. Further, the ruling concluded that all tool allowance payments under the arrangement must be included in the employees' gross income and reported on the employees' Forms W-2 and are subject to withholding and payment of Federal employment taxes.  Id., 2005-2 C.B. at 425.  Petitioner drafted the requested opinion dated September 14, 2005, and a related executive summary.  This opinion, like petitioner's earlier opinions, did not address the existing tool plan or the valuation formula provided by CMS.  Petitioner knew CMS relied on this opinion and used it to help sell the CMS tool plans.  Petitioner knew Mr. Lemay had requested the executive summary so that CMS and Xell had a shorter, less complete version of the opinion to distribute to clients.

[*34] The September 14, 2005, opinion and its executive summary stated that there was "substantial authority" to conclude that reimbursement for tools acquired after enrollment, i.e., the new tool plan, would be nontaxable. As with prior opinions written by petitioner, "substantial authority" meant a 33.5% chance that the plan would survive IRS scrutiny. With respect to the tool use plan, petitioner again concluded that payments made to technicians for the use of their tools were not subject to self-employment or payroll taxes. Petitioner rejected KPMG's position that Rev. Rul. 2002-35, supra, precluded nontaxable status for usage payments made under a plan that fails to comply with the accountable plan rules, and he instead asserted that Rev. Rul. 2002-35, supra, opened alternative characterizations such as that promoted under CMS' use plan.

Petitioner's opinion and executive summary explained that, under Rev. Rul. 2005-52, supra, "employers using accountable plans to reimburse employees for the cost of providing tools must substantiate the expenses reimbursed and, to the extent the plan provides payments before expenses are incurred, the plan must require that the employee return amounts in excess of the substantiated expenses." Petitioner understood this to mean that "the ruling clarifies that an accountable plan may not use estimates to substantiate the amount of the expenses." This negated the viability of CMS' existing tool plan; however, petitioner's

**[*35]** memorandum and executive summary did not address this concern. Petitioner's executive summary did not address the risks of using the three tool plans together. Further, in the executive summary petitioner reiterated the conclusions and rationale used in prior opinions, despite new rulings and legal advice that invalidated these positions.

Mr. Lemay once again sought a favorable independent opinion regarding the tool plans' compliance with relevant law, and he again contacted to McDermott. On December 16, 2005, CMS received another opinion from McDermott. The McDermott opinion warned:

> We believe you should anticipate an audit of a client in which the IRS will challenge the nontaxable "accountable plan" treatment of the reimbursements for both current and new inventory, subjecting all such payments to income and FICA taxes on the basis that the reimbursements are amounts that would be paid anyway (i.e., as a usage payment), thus violating the accountable plan regulations. The IRS is unlikely to respect the reimbursement arrangement nor to recognize the usage payment as separate from the compensation for services, subjecting the usage payment to FICA taxes as well.

The McDermott opinion advised that Rev. Rul. 2005-52, supra, "makes it harder for prospective CMS clients to rely upon the positions being asserted by CMS." McDermott went on to explain that the revenue ruling required tool allowance payments to be included in gross income and reported as wages subject to withholding and employment taxes if the arrangement does not require

**[*36]** substantiation and return of excess payments, as required under the accountable plan rules. McDermott noted that CMS' reimbursement program appeared "almost indistinguishable" from the program discussed in Rev. Rul. 2005-52, supra, notwithstanding CMS' proprietary calculations. CMS did not distribute this opinion to clients or potential clients. Mr. Lemay and CMS made no changes to the Tool Program as a result of this opinion.

Petitioner wrote another opinion in support of the Tool Program dated July1, 2007. Mr. Lemay did not use this opinion primarily for the purpose of selling the Tool Program, because CMS and Xell were not selling the Tool Program at that point. Nevertheless, the opinion was distributed to existing clients, and petitioner wrote it under the assumption that it would be used to market the Tool Program. Petitioner addressed the existing tool plan in his July 1, 2007, opinion. He concluded that "substantial authority" supported the position that reimbursements for tools acquired before and after the initiation of CMS' tool reimbursement plan were nontaxable under the accountable plan rules.

Around October 2007 CMS made its first substantive change to the tool program. At that time CMS began to require receipts for purposes of substantiating payments made under the reimbursement plans. Although this was a change to the Tool Program that appeared to be required in the light of Rev. Rul.

[*37] 2005-52, supra, and was advised by McDermott in its 2005 memorandum, CMS waited over two years to make this change. CMS did not discontinue the existing tool plan for those already enrolled and made no other substantive changes to the Tool Program. Therefore, those already enrolled in the existing tool plan did not have to provide receipts.

Petitioner wrote one more memorandum to CMS dated November 28, 2007, in response to a Chief Counsel Advice (CCA) in which the IRS announced increased audit attention would be paid to tool reimbursement plans, such as those marketed and administered by CMS. Petitioner described the recent CCA as follows:

> This CCA raises some serious concerns regarding [the] CMS existing tool plan * * * I am concerned that CMS clients need to acknowledge and understand a "substantial authority" conclusion only avoids tax penalties; not actual tax and interest. At this point, I am not ready to recommend a Draconian approach of suspending the existing tool plan and seeking a legislative remedy, but it should be in the back of our collective minds.

Petitioner knew that CMS did not attempt to verify client-employees' statements regarding the costs, business use, depreciation, and prior reimbursements for their tools. He recommended that CMS start requiring client-employees to reimburse their employers for excess reimbursements. Petitioner acknowledged that the existing tool plan was the "Achilles heel" of the Tool Program and that no matter

**[\*38]** what CMS did to change the existing tool plan, it might not be enough to bring it into compliance. Despite repeated advice to the contrary, petitioner stated his confidence that the tool use plan would pass IRS muster and complied with the relevant rules and regulations. As to the new tool plan, petitioner stated it should easily pass IRS muster.

On August 22, 2008, Mr. Lemay emailed petitioner and the other CMS board members indicating that a client of CMS had notified Mr. Lemay that the IRS issued a coordinated paper dated July 2, 2008, in which it concluded that the tool and equipment plans it had seen to date failed to meet the accountable plan requirements. Mr. Lemay subsequently forwarded to petitioner and other CMS board members an article published in the August 22, 2008, issue of Payroll Currently entitled "Tool Plan Payments Must Be Included in Employees' Gross Income, IRS Says", which discussed the IRS coordinated paper referenced in the email dated August 22, 2008. That article ultimately concluded that "the routine reimbursement of unsubstantiated expenses and the practice of recharacterizing wages as reimbursements until the employee's tool inventory value is zeroed out, only to reinstate the original wage amount at that point, 'evidence a pattern of abuse of the accountable plan rules.'"

[*39] VII.    Client Audits, Injunction, and Penalties

      A.    Client Audits and Injunctions Against CMS, Lemay, and Petitioner

Several CMS clients' returns were audited by the IRS in connection with their participation in the CMS Tool Program beginning in 2008. In total 24 CMS client-employers had returns audited by the IRS. Mr. Lemay received calls from many of these clients regarding audit representation, and Mr. Lemay provided these clients with a protest letter drafted by petitioner defending the CMS tool plans. Each of CMS' clients whose returns were audited was required to remit additional employment taxes. The total resulting tax due was $4,591,106.

In February 2008 the United States initiated an action against petitioner to enjoin him from promoting tax shelters. Mr. Lemay was aware of the suit when it was initiated. CMS took no action against petitioner on the basis of the injunction action. Petitioner continued to provide assistance to CMS clients with returns under audit while his lawsuit was pending.

On May 11, 2010, the U.S. District Court for the Western District of Missouri found that petitioner had "routinely falsely and fraudulently advised clients that his tax arrangements were legal." The District Court concluded that petitioner's "record establishes that this cycle will continue unless he is barred from providing tax advice without significant restraint." Therefore, the District

[*40] Court enjoined petitioner from organizing, establishing, promoting, selling, offering for sale or helping to organize, establish, promote, sell, or offer for sale any tax plan. As a result of the injunction, petitioner's C.P.A. licenses were suspended in 2011.

The District Court required petitioner to provide a copy of its order within 60 days to each client for whom he had provided any type of tax-related advice within the last five years. Petitioner did not provide a copy of the injunction to any of CMS' client-employers or client-employees. Petitioner did notify CMS and Mr. Lemay of the injunction. Despite the injunction, CMS continued to distribute protest letters prepared by petitioner to CMS clients with returns under audit. Mr. Lemay did not notify CMS clients that petitioner was being sued for the promotion of tax shelters. On December 17, 2010, petitioner was officially suspended indefinitely from representing anyone in front of the IRS; however, CMS continued to distribute an unsigned version of petitioner's protest letter to its clients.

B.    Section 6700 Penalty Examination

In 2008 the IRS opened a section 6700 penalty examination against CMS, petitioner, and Mr. Lemay regarding the Tool Program. The matter was assigned to an IRS revenue agent (RA). The RA concluded that CMS and its principals,

[*41] including petitioner, made a number of false or fraudulent statements concerning the Tool Program, that petitioner knew or had a reason to know these statements were false or fraudulent, and that these statements had a substantial impact on the decision-making process of the clients and caused them to avoid the payment of employment taxes. Therefore, in accordance with section 6700, the RA determined that the IRS should assess penalties against CMS, petitioner, and Mr. Lemay.

To calculate the penalties against petitioner, the RA determined that CMS paid petitioner a retainer of $3,000 per month from 2008 to 2010. Therefore, the RA took the gross income petitioner derived from CMS for each tax year at issue, $36,000, and multiplied that amount by 50%, to arrive at penalties of $18,000 for tax years 2009 and 2010, $36,000 in total.

The RA prepared and submitted for supervisory approval Forms 8278, Assessment and Abatement of Miscellaneous Civil Penalties, on January 23, 2014, for the years at issue. The RA's immediate supervisor signed and dated the Forms 8278 on March 25, 2014. On June 23, 2014, respondent assessed penalties against petitioner pursuant to section 6700 for tax years ending December 31, 2009 and 2010, of $18,000 and $18,000, respectively. On that same day, respondent issued petitioner Notice CP15, Notice of Penalty Charge, for each of the tax years at issue

[*42] formally communicating to petitioner for the first time respondent's determination of these penalties. On July 15, 2014, petitioner submitted to respondent Forms 6118, Claim for Refund of Tax Return Preparer and Promoter Penalties, for the tax years at issue.[11] Petitioner paid $150 toward his penalty liability for each of the years at issue in conjunction with his submission of the Forms 6118. Respondent had not acted on petitioner's Forms 6118 by the time the notice of determination was issued on May 6, 2015.

Before respondent concluded the section 6700 penalty examination, petitioner and the U.S. Department of Justice executed a stipulated order for permanent injunction under sections 7402, 7407, and 7408. This stipulated order was signed by petitioner on January 9, 2013, and filed on January 14, 2013, with the District Court in which the injunction action was pending. This stipulated order enjoined petitioner from further promoting unlawful tool reimbursement, tool rental, or tool use tax avoidance schemes that could implicate sections 6700 and 6701. The stipulated order also enjoined petitioner from advising customers that the tool reimbursement and tool reimbursement plans, or any other similar plan, are consistent with the internal revenue laws. Petitioner, along with Mr.

_____

[11]The Notice CP15 stated consistently with sec. 6703(c)(1) that petitioner could pay not less than 15% of the penalty and file a claim for refund on Form 6118 for the amount paid within 30 days after the date of the Notice CP15.

**[*43]** Lemay, executed the same stipulated order on behalf of CMS, which was signed on January 4, 2013, and filed with the District Court on January 15, 2013.

VIII.  CDP Process

On August, 25, 2014, respondent sent petitioner a Final Notice of Intent to Levy and Notice of Your Right to a Hearing (levy notice) with respect to petitioner's unpaid section 6700 penalties for the tax years at issue.[12]  Petitioner timely submitted a Form 12153, Request for a Collection Due Process or Equivalent Hearing (CDP request), dated September 8, 2014, in response to his receipt of the levy notice.  Petitioner's CDP request disputed his underlying liability for the section 6700 penalties.

Petitioner's CDP request was assigned to a settlement officer (SO) with no prior involvement with the liabilities at issue.  On December 4, 2014, petitioner and the SO held a telephone CDP hearing.  During the call, petitioner and the SO discussed petitioner's submission of the two Forms 6118 on July 15, 2014.  At the time of the CDP hearing, because respondent had taken no action on petitioner's claims for refund, petitioner was eligible to file an action in District Court related

---

[12]The amount owed for each tax year at issue was $17,957, reflecting respondent's assessment of additional interest of $107 for each year and petitioner's having paid $150 toward each penalty in conjunction with submitting his Forms 6118.

[*44] to his claim for refund. The SO stated that he would hold petitioner's CDP case open until petitioner timely filed a refund claim in District Court. Petitioner stated that he would withdraw his CDP request upon filing a refund claim in District Court. Petitioner and the SO decided to hold a followup conversation on February 15, 2015, to verify that petitioner timely filed a refund claim in District Court and withdrew his CDP request.

On February 19, 2015, the SO called petitioner to get an update on the status of the CDP request withdrawal. The SO informed petitioner that he planned to sustain the proposed levy, and that a notice of determination would be forthcoming. Petitioner did not raise any collection alternatives or submit any financial information. On April 1, 2015, the SO called petitioner again to discuss petitioner's CDP case. The SO explained that he planned to sustain the proposed levy, but he informed petitioner that collection actions could not proceed while the refund decision was pending. Petitioner and the SO discussed petitioner's plan to immediately submit a Form 12257, Summary Notice of Determination, Waiver of Right to Judicial Review of a Collection Due Process Determination, Waiver of Suspension of Levy Action, and Waiver of Periods of Limitation in Section 6330(e)(1), for the tax years at issue. The SO sent a letter to petitioner dated April 1, 2015, enclosing the Form 12257.

[*45] On April 16, 2015, the SO called petitioner to inquire as to why he had not received petitioner's Form 12257. Petitioner indicated he decided not to sign the waiver, and that he was disputing the underlying liabilities. The SO explained that he would issue a notice of determination sustaining the penalties shortly. The SO also reaffirmed that respondent could not move forward with collection until petitioner's refund claim was resolved.

On May 6, 2015, the Appeals Office issued a notice of determination sustaining the proposed levy. The notice of determination indicated that petitioner did challenge the existence or amount of the tax liabilities on his CDP hearing request form and that during the CDP process petitioner stated that he disagreed with the assessment of the section 6700 penalties. The notice of determination also indicated that respondent could not move forward with collection until petitioner's refund claims had been considered or deemed invalid.

On June 8, 2015, petitioner timely filed a petition with this Court.

OPINION

I.    Standard of Review

Section 6330 requires the Commissioner to notify a taxpayer if he intends to levy on that taxpayer's property. The notice must inform the taxpayer of his or her right to a CDP hearing regarding the proposed collection action. Sec. 6330(a). In

[*46] a CDP hearing taxpayers may raise any relevant issue or request the consideration of a collection alternative. Sec. 6330(c)(2)(A). Taxpayers may not challenge the existence or amount of the underlying tax liabilities unless they did not receive a statutory notice of deficiency or otherwise have an opportunity to dispute the liabilities. Sec. 6330(c)(2)(B). Once the Commissioner issues a notice of determination at the conclusion of the CDP hearing, the taxpayer may seek judicial review by timely filing a petition with this Court. Sec. 6330(d).

When the underlying tax liability is properly at issue, we review that determination de novo. Sego v. Commissioner, 114 T.C. 604, 610 (2000). In the instant case, the underlying liabilities are attributable to the section 6700 penalties imposed on petitioner for promoting abusive tax shelters. This Court has jurisdiction to review the Commissioner's determination when the underlying tax liability stems from section 6700 penalties. Gardner v. Commissioner, 145 T.C. 161, 174 (2015), aff'd, 704 F. App'x 720 (9th Cir. 2017). Section 6700 penalties are not subject to deficiency procedures. Sec. 6703(b). Respondent concedes that petitioner did not have an opportunity to dispute his liability for the section 6700 penalties with the Appeals Office before his administrative CDP hearing. Further, the parties proceeded as if petitioner's underlying liabilities were appropriately challenged and properly at issue in this case. We follow the lead of the parties and

**[*47]** review de novo the question of petitioner's liabilities under section 6700.
We review all remaining issues for abuse of discretion, to ensure those
determinations were not arbitrary, capricious, or without sound basis in fact or
law. See Murphy v. Commissioner, 125 T.C. 301, 320 (2005), aff'd, 469 F.3d 27
(1st Cir. 2006); see also Goza v. Commissioner, 114 T.C. 176, 181-182 (2000).

II.     Section 6700 Penalties

   A.     Burden of Proof

        Section 6700 penalties are subject to the procedural rules of section 6703.
Section 6703(a) provides that the Secretary bears the burden of proving a
taxpayer's liability with respect to penalties assessed under section 6700. This
Court has not decided the appropriate standard of proof in determining liability
under section 6700. This Court, in Gardner v. Commissioner, 145 T.C. at 175
n.10, cited a Court of Appeals for the Ninth Circuit decision affirming a District
Court's application of the preponderance of the evidence standard in a section
6700 case. Additionally, the Court of Appeals for the Tenth Circuit applied the
preponderance of the evidence standard in a case for injunctive relief under
section 7408 based on a violation of section 6700. United States v. Hartshorn, 751
F.3d 1194, 1198 (10th Cir. 2014). We will follow the Court of Appeals for the
Tenth Circuit, the likely appellate venue, and apply a preponderance of the

**[\*48]** evidence standard.  See Golsen v. Commissioner, 54 T.C. 742, 757 (1970),

aff'd, 445 F.2d 985 (10th Cir. 1971).[13]

B.    Elements and Application

To satisfy the burden of proof with respect to section 6700, respondent must

prove by a preponderance of the evidence that petitioner:  (1) organized (or

assisted in the organization of) or participated (directly or indirectly) in the sale of

an interest in an investment plan or arrangement, or any other plan or arrangement

and (2) made material statements concerning the "tax benefits"[14] to be derived

from that plan or arrangement that petitioner knew or had reason to know were

false.  See sec. 6700(a).  We address these requirements in turn.

---

[13]This Court has applied a preponderance of the evidence standard with respect to analogous penalties, such as penalties under sec. 6702(a) for frivolous tax submissions.  See O'Brien v. Commissioner, T.C. Memo. 2012-326. Additionally, a number of Federal courts have specifically held that preponderance of the evidence is the appropriate standard of proof under sec. 6700.  See United States v. Estate Pres. Servs., 202 F.3d 1093, 1098 (9th Cir. 2000); Barr v. United States, 67 F.3d 469, 469 (11th Cir. 1995).

[14]For purposes of sec. 6700, "statements concerning the tax benefits" means the following:  a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement".  Sec. 6700(a)(2)(A).

**[\*49]**        1.        <u>Petitioner Participated in the Sale of a Plan or Arrangement Subject to Section 6700 Penalties.</u>

Petitioner does not refer to specific evidence contending that the CMS Tool Program was not a plan or arrangement under section 6700. Section 6700 does not define the terms "investment plan or arrangement" or "any other plan or arrangement". Further, there are no regulations defining what conduct constitutes the organization of an entity, plan, or arrangement described in section 6700(a)(1)(A). Nevertheless, Federal caselaw on this issue instructs that a "plan or arrangement" under section 6700 should be defined broadly, and that the "sale of a plan or arrangement" component of section 6700 "is satisfied simply by 'selling an illegal method by which to avoid paying taxes.'" <u>See</u> <u>United States v. Stover</u>, 650 F.3d 1099, 1107 (8th Cir. 2011) (quoting <u>United States v. Benson</u>, 561 F.3d 718, 722 (7th Cir. 2009)). For purposes of section 6700, "any 'plan or arrangement' having some connection to taxes can serve as a 'tax shelter' and will be an 'abusive' tax shelter if the * * * [promoter] makes the requisite false or fraudulent statements concerning the tax benefits of participation." <u>United States v. Raymond</u>, 228 F.3d 804, 811 (7th Cir. 2000). Engaging in a broad range of marketing activities constitutes participation in the sale of any interest in an entity,

**[*50]** plan, or arrangement, for purposes of section 6700. See id.; see also United States v. Kaun, 827 F.2d 1144, 1149-1150 (7th Cir. 1987).

We conclude that respondent has demonstrated that the CMS Tool Program is a plan or other arrangement under section 6700 and that petitioner assisted and participated in that plan or arrangement. To those ends, evidence shows, and we find, that CMS marketed and sold the Tool Program as a multistep benefit plan through which employers and employees could avoid paying taxes and that petitioner was a primary and indispensable figurehead in the plan's marketing and sale. The Tool Program consisted of three different tool plans: (1) the existing tool plan; (2) the new tool plan; and (3) the tool use plan. CMS operated the tool plans in sequence, thereby attempting to maximize the purported lifetime tax savings for enrolled employees and employers. In addition to the tool plans and payroll administration, CMS promised to offer legal research and free audit representation as part of an overall employee benefits package. CMS charged fees for administering the tool plans. All CMS' claims that the Tool Program offered a legal avenue to achieve tax savings were unsupported by law or regulations. Further, all independent tax professionals with whom petitioner and Mr. Lemay consulted rejected the position that the Tool Program provided its enrollees a means to achieve legal tax savings. We find that CMS administered a multistep

[*51] benefits program, the Tool Program, that had as its primary purpose the reduction of Federal income and employment taxes. Therefore, the Tool Program constituted a plan or arrangement under section 6700. See Kaun, 827 F.2d at 1144, 1149-1150; see also United States v. Zanfei, No. 04 C 2703, 2006 WL 2861051, at *8 (N.D. Ill. Sept. 29, 2006).

Petitioner argues that he earned fees from CMS for independent legal defense work and was not involved in the organization or facilitation of sales of the CMS Tool Program. We conclude that respondent has shown that petitioner assisted in the organization of the Tool Program and participated in the sale thereof. CMS existed solely to market and operate the Tool Program. Petitioner was not an independent tax adviser to CMS. Petitioner had sat on CMS' board of directors since November 20, 2002, and was listed on marketing materials as the legal authority and tax expert behind the Tool Program. At all relevant times, petitioner reviewed and provided advice regarding CMS' marketing materials. CMS relied on petitioner's legal opinions in creating its marketing materials. Petitioner persisted in drafting favorable, outcome-oriented opinions in support of the legality of the tool plans, despite uniform and repeated advice from independent tax professionals to the contrary. Petitioner created executive summaries of his opinions that did not clearly state the risks incident to enrolling

**[\*52]** in the Tool Program.  Petitioner knew that these executive summaries would be distributed to clients.

CMS offered client-employees the opportunity to speak with petitioner in order to ameliorate their concerns about the legality of the purported tax benefits available under the Tool Program.  Petitioner did in fact speak with client-employees about their concerns with the Tool Program.  Ultimately, CMS based its marketing materials entirely on the legal theories and opinions developed by petitioner regarding the availability of tax benefits under the Tool Program.  Thus, petitioner was instrumental in facilitating the marketing and sales of the CMS Tool Program.

      2.     Petitioner Made Material Statements He Knew or Had Reason To Know Were False.

As relevant here, the section 6700 penalty applies when the organizer (or assistant thereto) or seller (or assistant thereto) of a subject plan makes or causes to be made any statement with respect to tax benefits arising from participation in such a plan that (a) is material and (b) he or she "knows or has reason to know is false".  See sec. 6700(a).  Statements covered by section 6700 include factual matters that are relevant to the availability of tax benefits and those directly addressing the availability of tax benefits.  See Stover, 650 F.3d at 1108.  Advice

**[\*53]** and recommendations are considered statements for purposes of section 6700. Id. Unqualified statements concerning the tax benefits of a subject plan have been found to be false or fraudulent statements under section 6700. See United States v. Gleason, 432 F.3d 678, 683-684 (6th Cir. 2005). The question of materiality does not require proof that anyone actually relied on the misrepresentations or lies of the promoter. Gardner v. Commissioner, 145 T.C. at 176. Rather, a statement is material if it would have a substantial impact on the decision-making process of a reasonably prudent investor or concerns matters relevant to the availability of a tax benefit. See United States v. Campbell, 897 F.2d 1317, 1320 (5th Cir. 1990).

The question of whether an alleged promoter's statements were knowingly false, or whether he or she had reason to know the same, is a question which requires an evaluation of what a reasonable person in his or her position would have discovered. See id. at 1321-1322. To determine whether an alleged promoter knew or had reason to know the statements he or she made were false, Federal courts have considered: (1) the extent to which he or she relied on knowledgeable professionals; (2) his or her sophistication and education; and (3) his or her familiarity with tax matters. United States v. Estate Pres. Servs., 202 F.3d 1093, 1103 (9th Cir. 2000); see Kaun, 827 F.2d at 1149. Further, if petitioner

**[*54]** knew his statements contradicted settled law or were contrary to express IRS guidance, he had reason to know that such statements might be and probably were false. See Stover, 650 F.3d at 1110. Additionally, omission of material facts weighs as heavily as making false material statements. See id. at 1109-1111; see also Hartshorn, 751 F.3d at 1202 (Court of Appeals for the Tenth Circuit applying section 6700 in the context of an injunction under section 7408 used the reasonable person test).

Petitioner does not specifically dispute that he made material statements regarding the tax benefits of the Tool Program. However, he contends broadly that he did not engage in any illegal conduct and did not make any material statements that he knew or had reason to know were false regarding the tax benefits of the Tool Program. Petitioner asserts that the record shows he was transparent with prospective clients regarding the risks incident to the Tool Program, specifically that the tool plans would likely be unsuccessful in an IRS audit. For support, petitioner points out that he never indicated that an enrollee would have a greater than 33.5% chance of prevailing in an audit.

**[*55]**      a.      <u>Material False Statements About the Existing Tool Plan</u>
<u>Compliance With the Accountable Plan Rules</u>

Respondent argues that petitioner made material false statements concerning the tax benefits of the Tool Program. Specifically, respondent contends that petitioner provided false and misleading legal conclusions in his tax opinions and marketing materials regarding the existing tool plan's compliance with the accountable plan rules. Further, respondent contends that such statements would have a substantial impact on a reasonably prudent investor's decision-making process because such statements include matters relevant to the availability of a tax benefit. See Campbell, 897 F.2d at 1320; see also Stover, 650 F.3d at 1111 ("[Stover] promised to reduce his client's taxable income by hundreds of thousands of dollars. Any such promise would have had a substantial impact on the decision making process of a reasonably prudent investor."). We agree with respondent and find that petitioner made false and misleading statements regarding the availability of tax benefits under the Tool Program, particularly as to the existing tool plan's compliance with the accountable plan rules.

Under section 62(a)(2)(A), an employee can deduct certain business expenses incurred in connection with the performance of services for an employer under a reimbursement or other expense allowance arrangement. If these expenses

**[*56]** are reimbursed by the employer pursuant to an "accountable plan", then the reimbursed amount is excluded from gross income and is not considered wages or other compensation. Sec. 1.62-2(c)(4), Income Tax Regs. Thus, expenses reimbursed pursuant to an accountable plan would be exempt from withholding and payment of employment taxes. See id. However, if the reimbursement is not made under an accountable plan, then the amount of the reimbursement is treated as wages and is included in the employee's taxable income. Id. subpara. (5).

To qualify as an accountable plan, the plan must: (1) have a business connection; (2) require substantiation of expenses; and (3) require the return to the employer of amounts exceeding the employee's actual expenses. Id. paras. (c), (d), (e), and (f). A reimbursed employee expense can be "in connection with" the performance of services as an employee, and excludable from gross income under the accountable plan rules, only if it is incurred by an employee on behalf of the employer that provides the reimbursement. Id. para. (d)(1). Reimbursements for expenses incurred before an employee's employment with his or her current employer are not incurred by an employee in the course of his or her current employment and would thus fail the business connection requirement. See Biehl v. Commissioner, 118 T.C. 467, 478 (2002), aff'd, 351 F.3d 982 (9th Cir. 2003).

**[\*57]** At all relevant times, the existing tool plan was marketed as an accountable plan. Promotional materials reviewed and endorsed by petitioner emphasized the existing tool plan's compliance with the laws and regulations on accountable plans. Although client-employees had the option of enrolling in one or more of the three Tool Plans, approximately 90% of all client-employees enrolled in the existing tool plan. Client-employees were instructed to, and did in fact, include on their enrollment forms the acquisition costs of tools that were unrelated to their work or purchased in years before their current employment. This practice is directly inconsistent with the business connection requirement of the accountable plan rules. See sec. 1.62-2(d)(1), Income Tax Regs.; see also Biehl v. Commissioner, 351 F.3d at 986-987 (stating that in order to meet the business connection requirement, reimbursed expenses must be incurred during the course of employment). Therefore, the existing tool plan did not meet the business connection requirement of the accountable plan rules.

Petitioner is a tax attorney and was a licensed C.P.A. His opinions discussed the accountable plan rules at length. He knew that the existing tool plan was aggressive and not in compliance with the accountable plan rules. Accordingly, while employed by Grant Thornton, petitioner declined to write an opinion in support of the availability of tax benefits under the existing tool plan.

**[\*58]** However, after submitting his resignation from Grant Thornton, he wrote an opinion endorsing the existing tool plan. He also wrote subsequent opinions in support of the existing tool plan's compliance with the accountable plan rules.

Petitioner wrote that the existing tool plan satisfied the business connection requirement under the accountable plan rules. He stated that the costs for existing tools should qualify as deductible ordinary and necessary business expenses and that enrollment in the CMS tool plan would result in an employee's being in a newly created trade or business. This plainly conflicts with existing law. Expenses for which an employee could claim reimbursement from his or her employer are not necessary business expenses. See Orvis v. Commissioner, 788 F.2d 1406,1408 (9th Cir. 1986) (stating that the prohibition against deductions for reimbursable expenses is a bright line rule and applies even when an employee is unaware that the expenses are reimbursable), aff'g T.C. Memo. 1984-533; see also Carver v. Commissioner, 51 T.C. 932, 936 (1969); Davis v. Commissioner, T.C. Memo. 1999-250.

Further, petitioner offered no support for his statement that signing up for the tool reimbursement program converts an employee into a person in a new trade or business with respect to his or her existing tool inventory. Also, as petitioner wrote in his analysis of the tool use plan, whether a trade or business exists is

[*59] determined by the amount of time devoted to the activity, whether it is performed on a regular or consistent basis, and whether there is a profit motive. Petitioner considered these factors in concluding that the tool use plan does not constitute a trade or business with respect to those employees effectively renting tools to their employer by enrolling in that plan.

Petitioner was aware that several independent tax firms advised CMS that the Tool Program, particularly the existing tool plan, did not comply with the accountable plan rules. Nevertheless, he did nothing to discourage CMS from promoting the existing tool plan. Further, as to the substantiation requirement under the accountable plan rules, employees must submit information to the employer sufficient to enable the employer to identify the specific nature of each expense and conclude that the expense is attributable to the employer's business activities. Sec. 1.62-2(e)(3), Income Tax Regs. Each of the elements of an expenditure or use must be substantiated to the payor. Namyst v. Commissioner, T.C. Memo. 2004-263, slip op. at 10, aff'd, 435 F.3d 910 (8th Cir. 2006); sec. 1.62-2(e)(3), Income Tax Regs. If an employee is not required to substantiate an expense to the payor for reimbursement, then the reimbursement arrangement is not an accountable plan. Sec. 1.62-2(e)(3), Income Tax Regs. Further, if an employee merely aggregates expenses into broad categories, or reports individual

[*60] expenses through the use of vague nondescriptive terms (such as "miscellaneous business expenses"), the substantiation requirement is not satisfied.  Id.

In determining the total acquisition costs of a client-employee's tools, CMS instructed the client-employee to list as many tools as possible, even unnecessary or previously acquired tools.  If the employee did not have records of the acquisition costs of his or her tools, the employee was instructed to estimate their costs.  Client-employees were not required to provide either receipts supporting the acquisition costs stated on the enrollment form or to list the dates they purchased their tools.  Although Mr. Lemay claimed CMS formally changed this rule in 2007 to require receipts, CMS did not in fact demand receipts from its current or prospective clients.  Per petitioner's review of CMS' enrollment form, petitioner knew that CMS did not require clients or prospective clients to list the cost of each separate tool but instead directed the client-employee to sort their tool costs into broad categories, including a "miscellaneous" category.  The instructions that petitioner reviewed and that CMS provided to client-employees are directly inconsistent with the substantiation requirement of the accountable plan rules.  See id.  Ultimately, because the existing tool plan did not meet the

**[*61]** business connection requirement or the substantiation requirement, it is not an accountable plan.

False statements under section 6700 include representations that a plan qualifies for special tax treatment when the plan does not comply with the law. See Koresko v. United States, 123 F. Supp. 3d 654, 682-689 (E.D. Pa. 2015). The opinions and marketing materials petitioner drafted included statements that the existing tool plan was in compliance with the law on accountable plans. Further, because statements concerning whether the existing tool plan qualified as an accountable plan are statements directly relevant to the availability of a tax benefit, such statements are material. See Campbell, 897 F.2d at 1320.[15] Therefore, petitioner made material false statements concerning the availability of tax benefits under the Tool Program with respect to the existing tool plan's qualification as an accountable plan.

### b. False Statements About the Tax Benefits of the Tool Use Plan

Petitioner claimed that the tool use plan allowed client-employees to charge their employers a nontaxable fee for the rental of the employees' tools during the

---

[15]The record establishes that petitioner failed the business connection and substantiation requirements of the accountable plan rules. Consequently, we need not address whether he failed the excess receipts requirement.

[*62] daily course of the employees' labor. Petitioner knew that the tool use plan failed the accountable plan requirements and did not attempt to claim the tool use plan was an accountable plan. Instead, petitioner claimed that the rental fees paid under the tool use plan fell outside the employment tax definition of wages and payments made thereunder would, from an employer's point of view, not be subject to the employment tax liability of the employer. Petitioner claimed that statutory authority and caselaw supported the tool use plan. Petitioner repeatedly failed to clearly communicate the risks incident to enrollment in the tool use plan, i.e., that he believed there was a 66.5% chance it would fail to pass IRS muster.

Petitioner was aware that independent tax professionals completely rejected his position that payments made under the tool use plan were not subject to Federal employment taxes. Further, petitioner knew that in Rev. Rul. 2002-35, supra, the IRS instructed that if a plan or arrangement does not satisfy one or more of the accountable plan requirements, all amounts paid under that arrangement are paid under a nonaccountable plan and taxed as wages. Nevertheless, petitioner persisted in promoting the tool use plan as nontaxable.

Statements are false when assertions are not qualified and customers are not notified that following the advice could subject them to IRS scrutiny. Stover, 650 F.3d at 1109-1110. Petitioner was repeatedly instructed as to the risks incident to

[*63] enrollment in the tool use plan, and he failed to clearly and unambiguously inform CMS' sales agents, prospective clients, and current clients of that risk. Therefore, petitioner made false statements as to the tax benefits incident to participation in the tool use plan, and by extension, the Tool Program. See id. Such claims were material because they concerned the availability of tax benefits under the Tool Program. See Campbell, 897 F.2d at 1320.

### c. Petitioner's False Statements Concerning the Risks of Enrolling in the Tool Program

Statements are false when promoters fail to qualify assertions about the availability of tax benefits and notify clients that following the statements could subject them to IRS scrutiny. See Stover, 650 F.3d at 1109-1110. Courts have repeatedly held that a tax promoter's failure to advise his clients of the requirements to qualify for a tax benefit qualifies as a false statement. See Gleason, 432 F.3d at 682, 683; Estate Pres. Servs., 202 F.3d at 1101.

Although petitioner stated in his opinions that there was a mere 33.5% chance that the new tool plan and the tool use plan would succeed in an IRS audit, CMS marketed the Tool Program as if there were little to no risk in enrollment. Instead, the marketing materials emphasized that the tool plans offered a no-cost-to-you increase in an employee's take-home pay. Executive summaries petitioner

**[\*64]** drafted represented that Grant Thornton had determined that the new tool plan and the tool use plan complied with applicable law and that the tax benefits purported to flow therefrom were supported by "substantial authority". Petitioner's executive summaries did not disclose that Grant Thornton, KPMG, McDermott, and Crowe rejected the position that legal authority supported the tool use plan and the new tool plan as administered by CMS. These executive summaries also failed to address or express confidence in the lawfulness of the existing tool plan, despite the fact that CMS marketed all three plans simultaneously. Petitioner and Mr. Lemay agreed to aggressively market the existing tool plan, despite their understanding that this plan carried a risk of penalties and was an aggressive tax planning tactic.

Petitioner's failure to inform CMS' clients that the IRS was closely scrutinizing tool reimbursement plans amounts to a failure to inform those clients that following his advice could subject them to IRS scrutiny. See Stover, 650 F.3d at 1109-1110. Further, petitioner did not truthfully disclose the risks incident to the purported tax benefits under the Tool Program, particularly benefits available under the existing tool plan. Id. Together, these omissions constitute the promulgation of additional false statements concerning the tax benefits available under the Tool Program. Id.; see Gleason, 432 F.3d at 682-683; see also Estate

[*65] <u>Pres. Servs.</u>, 202 F.3d at 1101.  Such statements are material precisely because they concern the availability of tax benefits under the Tool Program.  <u>See</u> <u>Campbell</u>, 897 F.2d at 1320.

d.    <u>Petitioner's Awareness That His Statements About the<br>Purported Tax Benefits of the Tool Program Were False</u>

Petitioner does not explicitly contend that he did not know or have reason to know his statements regarding the tool program were false.  Petitioner contends that his opinions appropriately identified and disclosed the risks of the Tool Program.

Courts have concluded that the "know or reason to know standard" means what a reasonable person in petitioner's subjective position would have discovered.  <u>See</u> <u>id.</u> at 1321-1322.  We look at (1) the extent to which petitioner relied on knowledgeable professionals; (2) petitioner's sophistication and education; and (3) petitioner's familiarity with tax matters.  <u>See</u> <u>Estate Pres.</u> <u>Servs.</u>, 202 F.3d at 1103.  Petitioner had reason to know that statements may be and probably are false when those statements contradict settled law or are contrary to express IRS guidance.  <u>See</u> <u>Stover</u>, 650 F.3d at 1110.

Petitioner was a practicing tax lawyer and a C.P.A. for over 20 years when he began writing opinions and creating marketing materials for CMS.  Petitioner

[*66] was a tax partner at Grant Thornton immediately before joining the CMS board of directors. CMS referred to petitioner in its marketing materials as a tax expert and legal authority and offered petitioner's contact information to prospective client-employers and employees who had questions about the legal aspects of the Tool Program. Petitioner has a history and pattern of promoting abusive tax shelters, and he has been enjoined from doing the same in the future. Put differently, petitioner has a documented history of knowing the falsity of his statements as to the availability of tax benefits under a plan or arrangement.

Petitioner was aware of guidance issued by the IRS indicating increased audit attention to tool reimbursement plans such as those marketed and administered by CMS. Petitioner was repeatedly advised by independent tax practitioners of the risks that the tool plans would fail to pass muster if returns were examined by the IRS. Crowe, Grant Thornton, KPMG, and McDermott informed petitioner that there was no legal authority for the tool use plan. Petitioner knew that the existing tool plan had little to no chance of success in an audit. Petitioner also knew that Grant Thornton disavowed the Tool Program on the grounds there was no legal support in favor of the tool plans.

Ultimately, petitioner was aware of the law and advice contravening the positions he supported with respect to the Tool Program. Further, his history as a

[*67] tax partner also cuts strongly in favor of a finding that he was aware that his statements were false with respect to the tax benefits available under the tool program. Therefore, petitioner knew or should have known that his statements were false with respect to the tax benefits available under the Tool Program.

III.    Supervisory Approval and Amounts of Penalties

Respondent bears the burden of production with respect to petitioner's liability for section 6700 penalties. See sec. 7491(c). As part of that burden, respondent must show that the written supervisory approval requirement of section 6751(b)(1) was timely complied with. See Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016). On the record before us we find that respondent has met his burden of production. The RA's immediate supervisor personally approved the initial determination of the section 6700 penalties assessed against petitioner on March 25, 2014, by signing the Forms 8278 for each of the years at issue. The penalties assessed were first formally communicated to petitioner by way of a Notice CP15, dated June 23, 2014, for each of the years at issue. Thus, written supervisory approval for the penalties was given before the first formal communication of the penalties to petitioner. See Belair Woods v. Commissioner, 154 T.C. __, __ (slip op. at 23) (Jan. 6, 2020); see also Clay v. Commissioner, 152 T.C. 223, 245-250 (2019).

[*68] Section 6700(a) provides that for any promoter who makes or causes to be made any material false statements relating to tax benefits, the amount of the penalty shall be equal to 50% of the gross income the promoter derived therefrom. Thus, the penalty is appropriately calculated as 50% of the gross income petitioner derived from selling, or participating in selling, the Tool Program.[16] Respondent assessed total section 6700 penalties against petitioner of $36,000. In determining the section 6700 penalty for each of the tax years at issue, the RA identified CMS' gross receipts derived from the Tool Program, and then multiplied that amount by 50%. For 2009 the RA identified gross receipts of $18,000. For 2010 the RA identified gross receipts of $18,000. The RA then multiplied the sum of these amounts, $36,000, by 50% as required by section 6700(a). Respondent determined penalties against petitioner pursuant to section 6700 for tax years ending December 31, 2009 and 2010, in the total amount of $36,000. Ultimately,

---

[16]Penalties under sec. 6700 are not assessed for discrete taxable years, but for conduct and transactions that occur over one or more taxable years, not on an annual basis. Planned Invs., Inc. v. United States, 881 F.2d 340, 344 (6th Cir. 1989). In Gardner v. Commissioner, 145 T.C. 161, 182 (2015), aff'd, 704 F. App'x 720 (9th Cir. 2017), this Court expressly agreed with the reasoning in Planned Investments, concluding that the sec. 6700 penalty is not necessarily tied to activities or amounts earned in a particular tax year and can be based on activities and amounts earned in other years.

**[\*69]** the penalties were appropriately assessed and accurately calculated, and respondent followed all administrative procedures.

IV.    Remaining CDP Issues

When the Court conducts a de novo review of an underlying liability, we review all determinations not involving the underlying liability for abuse of discretion. Craig v. Commissioner, 119 T.C. 252, 260 (2002).  An action constitutes an abuse of discretion if it is arbitrary, capricious, or without sound basis in fact or law. Giamelli v. Commissioner, 129 T.C. 107, 111 (2007).  This review is to ensure that the Appeals Office verified that the Commissioner complied with the requirements of all applicable law and administrative procedure, considered all relevant issues raised by the taxpayer, and considered whether the proposed collection action balances the need for the efficient collection of tax with the taxpayer's legitimate concern that the collection action be no more intrusive than necessary.[17]  See sec. 6330(c)(3).

The notice of determination sustained the collection action, with the caveat that collection could not proceed until petitioner's refund claim was closed.  The

---

[17]Petitioner did not request a collection alternative and failed to present necessary financial information for the SO to consider.  See sec. 6330(c)(2)(A)(iii).  The record shows the SO verified that the requirements of applicable law and administrative procedure were followed.

[*70] only issue that petitioner raised during his CDP hearing was his underlying liability. The SO addressed this issue. Further, the SO verified that the assessment of the section 6700 penalty was timely and that petitioner received all appropriate notices in this respect. Accordingly, petitioner does not allege, and we do not hold, that the SO abused his discretion in arriving at any of these determinations.

V.    Conclusion

We have considered all the other arguments of the parties, and to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered

for respondent.